Javier L. Merino
**DANN LAW**
1520 U.S. Highway 130, Suite 101
North Brunswick, NJ 08902
Phone: (216) 373-0539
Fax: (216) 373-0536
notices@dannlaw.com

[Additional counsel listed on signature page]

*Counsel for Plaintiffs and the Putative Classes*

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **CODY PEPPER, TERRI PEPPER, JULIUS BRYANT, KIMBERLY HUDSON, DEMYA JOHNSON,** and **ALLISON POWERS**, individually, and on behalf of all others similarly situated,<br><br>          Plaintiffs,<br><br>     v.<br><br>**FLUENT, INC.** and **REWARD ZONE USA, LLC,**<br><br>          Defendants. | Civil Action No. 1:21-cv-06581-JGK<br><br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY DEMAND ENDORSED HEREIN** |

Plaintiffs CODY PEPPER, TERRI PEPPER, JULIUS BRYANT, KIMBERLY HUDSON, DEMYA JOHNSON, and ALLISON POWERS, individually, and on behalf of all others similarly situated ("Plaintiffs") for their First Amended Class Action Complaint against Defendants FLUENT, INC. and REWARD ZONE USA, LLC (collectively, "Defendants"), allege, based upon personal knowledge with respect to their own experiences, and on information, belief, investigation of counsel, and review of public documents as to all other matters, as follows:

## NATURE OF THE ACTION

1.      This is a nationwide consumer class action against Defendants for sending unsolicited telemarketing text messages themselves and through unsupervised affiliated networks to consumers' residential and cellular telephones registered on the National Do Not Call Registry in violation of 47 U.S.C. § 227(c) and 47 C.F.R. § 64.1200 using automatic telephone dialing systems ("ATDS") in violation of 47 U.S.C.§ 227(b).

2.      Plaintiff Allison Powers also asserts violations of North Carolina state law prohibitions against unfair and deceptive practices in telemarketing, N.C. Gen. Stat. §§ 75-100, *et seq.*

3.      Plaintiffs Terri Pepper, Julius Bryant, and Kimberly Hudson also assert violations of Texas state law prohibitions against unfair and deceptive practices in telemarketing, Tex. Bus. and Comm. Code §§ 301.001, *et seq.*

4.      Plaintiff Cody Pepper also asserts violations of Washington state law prohibitions against unfair and deceptive practices in telemarketing, Wash. Stat. § 19.160.010, *et seq.*, Wash. Stat. § 19.86.010, *et seq.*, and Wash. Stat. § 80.36.005, *et seq.*

5.     Defendants did not obtain the prior express written consent (or any consent whatsoever) of Plaintiffs or Class members before sending the unsolicited text messages that form the basis for Defendants' liability.

6.     Furthermore, Plaintiffs Cody Pepper, Julius Bryant, Kimberly Hudson, DeMya Johnson, Allison Powers and members of the Do Not Call Classes defined below were registered on the National Do Not Call Registry when the violative text messages were sent.

7.     Plaintiffs bring this lawsuit to recover their damages and obtain redress on behalf of themselves and Classes of similarly situated individuals who were and are being targeted by Defendants' relentless barrage of automated—and oftentimes deceptive—telemarketing text messages.

## PARTIES, JURISDICTION, AND VENUE

8.     Plaintiff Cody Pepper ("Cody Pepper") is a citizen of Washington.

9.     Cody Pepper has registered his residential cellular phone number ending in 4946 on the National Do Not Call Registry since April 4, 2010.

10.     Plaintiff Terri Pepper ("Terri Pepper") is a citizen of Texas.

11.     Terri Pepper has registered her residential cellular phone number ending in 0401 on the National Do Not Call Registry since December 15, 2004.

12.     Plaintiff Julius Bryant ("Bryant") is a citizen of Texas.

13.     Bryant has registered his residential cellular phone number ending in 7782 on the National Do Not Call Registry since March 31, 2019.

14.     Plaintiff Kimberly Hudson ("Hudson") is a citizen of Texas.

15.     Hudson has registered her residential cellular phone number ending in 2672 on the National Do Not Call Registry since July 12, 2003.

3

16.     Plaintiff DeMya Johnson ("Johnson") is a citizen of Alabama.

17.     Johnson has registered her residential cellular phone number ending in 8330 on the National Do Not Call Registry since December 16, 2019.

18.     Plaintiff Allison Powers ("Powers") is a citizen of North Carolina.

19.     Powers has registered her residential cellular phone number ending in 9718 on the National Do Not Call Registry since November 17, 2007.

20.     Defendant Fluent, Inc. ("Fluent") is a Delaware corporation with its principal place of business at 300 Vesey St., 9th Floor, New York, New York 10282.

21.     Defendant Reward Zone USA, LLC ("Reward Zone") is a Delaware limited liability company with its principal place of business at 128 Court Street, 3rd Floor, White Plains, New York 10601. Fluent owns 100% of Reward Zone.

22.     The Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331, as the action arises under the Telephone Consumer Protection Act, 47 U.S.C. § 227.

23.     This Court has personal jurisdiction over Defendants because they maintain their principal places of business in this District, are at home in this District, and they conducted a significant amount of business in this District, solicited consumers in this District, and continue to direct, oversee, and engage in the complained of activity within this District.

24.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because each Defendant resides in this District and this Court has personal jurisdiction over each Defendant.

**<u>DEFENDANTS' BUSINESS PRACTICES</u>**

25.     Defendants' digital marketing and advertising services include performing customer acquisition services through digital marketing campaigns to connect their advertiser clients with consumers they seek to reach.

4

26.     For their business model to be profitable, Defendants must attract consumers at scale to their owned digital media properties, including their websites.

27.     Defendants readily admit that attracting consumers at scale is a key challenge for their business.  *See* Fluent SEC Form 10-K, page 24 (Mar. 16, 2021).

28.     In fact, Defendants admit that their "success depends on [their] ability to attract users to [their] websites and generate revenues from [the users'] activities thereon in a cost-effective manner."  Fluent SEC Form 10-K, page 15 (Mar. 16, 2021).

29.     In order to attract a sufficient number of consumers to satisfy their advertiser clients, Defendants rely on, and are dependent upon, third-party publishers or affiliate networks to drive consumers to their digital media properties and websites.  *See* Fluent SEC Form 10-K, pages 6, 11, 15 (Mar. 16, 2021).

30.     Specifically, Defendants admit that "[a] substantial majority of [their] revenue is attributable to visitor traffic originating from third-party publishers . . . ." Fluent SEC Form 10-K, page 15 (Mar. 16, 2021).

31.     Defendants are aware that their third-party publishers use text message marketing. Fluent SEC Form 10-K, page 16 (Mar. 16, 2021) ("We and our third-party publishers use email, **text messages**, push notifications, telephone calls and social media, among other channels, to reach users for marketing purposes." (emphasis added)).

32.     In fact, Defendants report that they have expanded their usage of text message marketing and have "become more dependent on third-party providers that control the dissemination and deliverability of such communications."  Fluent SEC Form 10-K, page 16 (Mar. 16, 2021).

33.     Defendants even cite spam blockers or "text message blocking algorithms" as obstacles to their marketing business they must face moving forward.  *See* Fluent SEC Form 10-K, pages 16, 24 (Mar. 16, 2021).

34.     Defendants rely on text message marketing because it is highly successful as compared to other forms of marketing.

35.     According to Twilio, open rates for SMS marketing were around 82% in 2017.

36.     Consumers clicked through to links in text messages at a 36% rate on average. *See* https:// www.twilio.com/learn/call-and-text-marketing/sms-marketing-vs-email (last visited May 25, 2021).

37.     Defendants recognize that their dependence upon their third-party publishers exposes them to various risks and liabilities if they or their third-party agents fail to comply with applicable laws and regulations.  *See, e.g.,* Fluent SEC Form 10-K, page 16, 24 (Mar. 16, 2021).

38.     Specifically, Defendants are aware that their third-party publishers "may use unapproved marketing channels, such as SMS, to drive users to [Defendants'] sites, which may expose [Defendants] to liability under the TCPA."  Fluent SEC Form 10-K, page 16 (Mar. 16, 2021).

39.     Due to the sheer scale of the text message marketing campaigns deployed by their third-party publishers, Defendants claim that they "cannot police all such behavior" and that their third-party agents expose them to considerable risk, which they simply assume in the interest of making a profit.  Fluent SEC Form 10-K, page 16 (Mar. 16, 2021).

40.     Recently, Defendants admit to having a quality issue with their affiliate traffic and the leads sourced by their third-party publishers that resulted in the implementation of a Traffic

Quality Initiative designed to "curtail the volume of lower quality affiliate traffic . . . ."  Fluent SEC Form 10-K, page 3 (Mar. 16, 2021).

41.     The text messages utilized by Defendants and their publishers use deceptive and fraudulent tactics to entice a consumer to click on the link contained therein.

42.     For example, some messages fraudulently purport to provide updated tracking information for a package being sent to the recipient while others offer limited time deals or giveaways.

43.     Ultimately, once a consumer clicks the link contained in the text messages, they are either forwarded directly to one of Defendants' websites or forwarded to an intermediate website operated by the third-party publisher that is designed to drive the consumer to one of Defendants' websites.

44.     This marketing scheme designed, deployed, and approved by Defendants and which benefits Defendants flagrantly disregards numerous laws, including laws protecting consumer privacy and rights to be free from unwanted telephone marketing solicitation.

### DEFENDANTS AND THEIR PUBLISHERS SENT TELEMARKETING TEXT MESSAGES WITHOUT PRIOR CONSENT

#### *Plaintiff Terri Pepper*

44.     On August 20, 2020, at 9:59 a.m., Terri Pepper's phone number ending in 0401 received the following text from Defendants and/or their third-party publishers purportedly originating from cashappalertskbfkyf@thzukj.com: "$750 Cash-App-Transfer is pending your confirmation thzukj.com/8066830401nkcosba."

45.     At or around the time the text message was sent, clicking on the link caused one's smartphone Internet browser to open, navigate automatically and instantaneously through intermediary domain thzukj.com, and land on promotionsonlineusa.com, a Reward Zone website:



46.     Defendants and their publishers did not obtain Terri Pepper's prior express consent before sending this text message.

### *Plaintiff Cody Pepper*

47.     On January 14, 2020, at 5:48 a.m., Cody Pepper's phone number ending in 4946 received the following text from Defendants and/or their third-party publishers purportedly originating from (760) 963-3611: "Amazon 2020 resolutions: 1) not to be greedy 2) care more about the customers. So you'll get $130 freebies to do a survey TERRI -> a8vrm.info.SRbTldZ1eEZ."

8

48.     On January 15, 2020, at 6:53 p.m., Cody Pepper's phone number ending in 4946 received the following text from Defendants and/or their third-party publishers purportedly originating from (831) 620-9366: "Hello TERRI, your FEDEX package with tracking code GB-6412-GH83 is waiting for you to set delivery preferences: b7cne.info/p4AnWKmSAsV."

49.     On September 26, 2020, at 9:56 a.m., Cody Pepper's phone number ending in 4946 received the following text from Defendants and/or their third-party publishers purportedly originating from (347) 225-4612: "Fanta, final notice about the USPS shipment 3D56R5 from 07/14/2020. Click sj1v.info/PhlJ11CHRu."

50.     At or around the time the text message was sent, clicking on the link caused one's smartphone to open an Internet browser page, navigate automatically and instantaneously through intermediary domains, including jtuzd.rdtk.io, go.dejeconia.com, and land on Enteprize.com, a website operated by Defendants or one of Defendants' publishers designed to steer web traffic to Defendants' websites:



51.    Enteprize.com contains a purported comment section with the top comment from "Frank Taylor" beginning with the statement, "I'm generally pretty "meh" about doing surveys, but I thought I'd give this one a shot." (the "Taylor comment").

52.    Entreprize.com offered a purported "exclusive reward" after the user responded to a series of questions:



53.     The user completed a survey and was offered a list of rewards to claim. The user clicked on the back button on the Internet browser, which took the user to winprizelah.com, a website operated by Defendants or Defendants' publishers designed to drive consumers to one of Defendants' websites:



54.     The first spin of the wheel began automatically once the user selected the OK button and landed on spin again. A pop-up box appeared and the user clicked "OK". The wheel automatically began to spin again and landed on Amazon gift card:



55.    The user clicked continue on the page that loaded and the Internet browser navigated to retailproductsusa.com, a Reward Zone website:



56.    The $1000 Amazon Gift Card offer displayed on Defendants' website was the same or similar to that offered on the prior website of Defendants' third-party publisher.

57.    On September 30, 2020, at 10:18 a.m., Cody Pepper's phone number ending in 4946 received the following text from Defendants and/or their third-party publishers purportedly originating from (646) 328-8703: "Fanta, your regular Netflix payment is on hold: te5n.info/iUfnDc3Byr."

58.    At or around the time the text message was sent, clicking on the URL displayed in the text message would navigate the user automatically and instantaneously through numerous

intermediary domains, including jtuzd.rdtk.io, go.farbrani.com, secure.ondemandvideotrk.xyz, and go.jurorem.com, and land on rewardsproven.com, a website operated by Defendants or Defendants' publishers designed to drive consumers to one of Defendants' websites:



59.    Clicking OK caused the wheel underneath the pop up box to spin. After spinning the wheel once and getting a free spin, the wheel landed on $1000 PayPal card on the second spin:



60.     Then, a pop up box automatically populated the screen with a large green button saying "Claim Your Prize":



61.     Clicking on the "Claim Your Prize" button directed the user to promotionsonlineusa.com, a Reward Zone website, where it stated "Answer to proceed towards your reward" and the screen displayed "Do you want a PayPal gift card?"; "$1000 to your PayPal Account"; and "Status: Available!":



62.     Defendants and their publishers did not obtain Cody Pepper's prior express consent before sending these text messages.

### *Plaintiff Julius Bryant*

63.     On April 30, 2020, at 1:03 p.m., Bryant's phone number ending in 7782 received the following text from Defendants and/or their third-party publishers from the number purporting to be (281) 972-5614: "Congratulations Five of you received $500 gift card from Walmart. Claim it at giftcars.us T4 Thursday 1:03 p.m."

64.     At or around the time the text message was sent, clicking on the link caused one's smartphone to open its Internet browser and navigate automatically to promotionsonlineusa.com, a Reward Zone website.

65.     On May 12, 2020, at 3:47 p.m., Bryant's phone number ending in 7782 received the following text from Defendants and/or their third-party publishers from the number purporting to be (346) 347-7886: "One package is available for shipment…Confirm delivery-address http://bg.totaltrack6.us/xhnft/bnFHKdP here."

66.     At or around the time the text message was sent, clicking on the link caused one's smartphone to open an Internet browser page, navigate automatically and instantaneously through intermediary domains, including radinator.com, and land on Joysurveys.com, a website operated by Defendants or Defendants' publishers designed to drive consumers to one of Defendants' websites which, like the message sent to Cody Pepper, also contains the Taylor comment:



67.     After responding to questions, the user was offered a list of rewards to claim. Selecting the back button in the user's browser sent the user to promotionsonlineusa.com, a Reward Zone website, offering a $1000 MasterCard gift card upon completion of "ten deals."



68.     Defendants and their publishers did not obtain Bryant's prior express consent before sending these text messages.

### *Plaintiff Kimberly Hudson*

69.     On June 6, 2020, at 12:26 p.m., Hudson's phone number ending in 2672 received the following text from Defendants and/or their third-party publishers from the number purporting to be (657) 368-9881: ALERT: Kimberly, please check the details for shipment ID: AmazonRewards 4G5sR3 here: g7smv.info/G6i7EP499d Package: $110 goodies."

70.     At or around the time the text message was sent, clicking on the link caused one's smartphone to open an Internet browser page and navigate automatically through intermediary domains including, g7smv.info, jtuzd.rdtk.io, and go.bloatedmi.com, and land on todaysnewcustom.com, a website operated by Defendants or Defendants' publishers designed to drive consumers to one of Defendants' websites:



71.     The website included the Taylor comment and featured a survey. The user responded to the questions and then was presented an opportunity to choose from a list of "exclusive rewards." Selecting the back button on the user's Internet browser directed the user to

bigprizeclaim.com, a website operated by Defendants or Defendants' publishers designed to drive consumers to one of Defendants' websites:



72.     The site contained a prize wheel that the user spun. The first spin landed on extra spin. The second spin landed on a $1000 Wells Fargo gift card. Selecting the "claim now" button sent the user to promotionsonlineusa.com, a Reward Zone website:



73.    On June 21, 2020, at 1:37 p.m., Hudson's phone number ending in 2672 received the following text from Defendants and/or their third-party publishers from the number purporting to be (714) 552-2357: "Kohls ALERTS: not $129, but for FREE! That's the Kohl's deal of the week: h6smz.info/n7rJp9kYFi."

74.    At or around the time the text message was sent, clicking on the link caused one's smartphone to open an Internet browser page, navigate automatically and instantaneously through intermediary domains, including h6smz.info, jtuzd.rdtk.io, and go.radionter.com, and land on

program.mynewrewto.com, a website operated by Defendants or Defendants' publishers designed to drive consumers to one of Defendants' websites:



75.    After taking the survey, the user was offered rewards to claim from a list. Selecting the back navigation button on the user's Internet browser directed the user to approvedreward.com, a website operated by Defendants or Defendants' publishers designed to drive consumers to one of Defendants' websites:



76.     Scrolling down presented the user with a green button that said "Claim Now." Clicking the button directed the user to promotionsonlineusa.com, a Reward Zone website:



77.    On September 9, 2020, at 11:04 a.m., Hudson's phone number ending in 2672 received the following text from Defendants and/or their third-party publishers from the number purporting to be (302) 423-3111: "Kimberly, final notice for the USPS shipment 5l77D1 from 05/21/2020. Go to: m5smz.info/RX7EDFhV2y."

78.    At or around the time the text message was sent, clicking on the link caused one's smartphone to open an Internet browser page, navigate automatically and instantaneously through intermediary domains, including m5smz.info, jtuzd.rdtk.io, go.heriliquic.com, and land on enteprize.com, a website operated by Defendants or Defendants' publishers designed to drive

consumers to one of Defendants' websites. Survey questions were answered and rewards were offered. Selecting the back button on the Internet browser directed the user to winprizelah.com, a website operated Defendants or Defendants' publishers designed to drive consumers to one of Defendants' websites:



79.     The first spin landed on spin again. The second spin landed on a $1000 Amazon Gift Card. The next page displayed a continue button next to an image of the gift card, which when clicked, directed the user to retailproductsusa.com, a Reward Zone website:



80.     On September 10, 2020, at 6:57 p.m., Hudson's phone number ending in 2672

received the following text from Defendants and/or their third-party publishers from the number

purporting to be (803) 436-9097: "Kimberly, urgent notice about the USPS shipment 1R56L8 from

07/20/2020. Go to: m6szv.info/Ek3HNighS."

81.     At or around the time the text message was sent, clicking on the link caused one's

smartphone to open an Internet browser page and navigate automatically and instantaneously

through intermediary domains, including jtuzd.rdtk.io, go.heriliquic.com, and land on

enteprize.com, a website operated by Defendants or Defendants' publishers designed to drive consumers to one of Defendants' websites:



82.     The user responded to several questions and was offered an opportunity to claim an "exclusive reward." The user selected the back navigation button on the Internet browser and was directed to winprizelah.com, a website operated by Defendants or Defendants' publishers designed to drive consumers to one of Defendants' websites:



83.     The user clicked the OK button and the wheel began to spin. The wheel landed on

spin again and a pop-up box displayed. The user clicked OK and the second spin landed on a $1000

Amazon gift card. The next page displayed an image of the gift card next to a continue button:



84.    The user selected the continue button and the Internet browser navigated to retailproductsusa.com, a Reward Zone website, which displayed the same or similar $1000 Amazon Gift Card offer:



85.     On September 26, 2020, at 7:46 p.m., Hudson's phone number ending in 2672 received the following text from Defendants and/or their third-party publishers from the number purporting to be (310) 561-5765: "Alejandra, urgent notice about your USPS shipment 5H32S4 from 06/15/2020. Proceed to sq2m.info/9FcacRuroR."

86.     At or around the time the text message was sent, clicking on the link caused one's smartphone to open an Internet browser page and navigate automatically through intermediary domains sq2m.info, gol.daminary.com, to sprogram.ournewwayz.com, a website operated by Defendants or Defendants' publishers designed to drive consumers to one of Defendants' websites:



87.     The Taylor comment is shown in the website and a 7-question survey is offered. After completing the survey, the user is offered one of a list of rewards. Selecting the back button on the Internet browser directs the user to werewardus.com, a website operated by Defendants or Defendants' publishers designed to drive consumers to one of Defendants' websites:



88.     The first wheel spin landed on spin again. The second spin landed on a $1000 Amazon gift card. A Claim Now button appeared in a pop-up box. The user selected the "Claim Now" button and the Internet browser automatically navigated to promotionsonlineusa.com, a Reward Zone website that displayed the same or similar $1000 Amazon Gift Card Offer:



***Plaintiff DeMya Johnson***

89.     On May 9, 2020, at 11:15 a.m., Johnson's phone number ending in 8330 received the following text from Defendants and/or their third-party publishers from the number purporting to be (949) 550-7289: "Important! DeMya, Seems you didn't open the door when we tried to deliver your $1,000 Wal-Mart Shopping Cards. Click here to confirm cfc.info/9TsUNJqr3N."

90.     At or around the time the text message was sent, clicking on the link caused one's smartphone to open an Internet browser page, navigate automatically and instantaneously through

intermediary domains, including cfc1.info, track.clicktrack.mobi, cspnccrzone.com, and land on promotionsonlineusa.com, a Reward Zone website shown below:





91.     On May 14, 2020, at 12:21 p.m., Johnson's phone number ending in 8330 received the following text from Defendants and/or their third-party publishers from the number purporting to be (714) 732-7713: "**Ben 800k cleaned Demya** – You WON! Please fill in your details here so you get your new iPhone 11 Pro Max right now bmgmg.info/mRtry8aKJT."

92.     At or around the time the text message was sent, clicking on the link caused one's smartphone to open an Internet browser page and navigate automatically and instantaneously through intermediary domains, including bmgmg.info, bszyd.rdtk.io, and land on ftsts.info, a

website operated by Defendants or Defendants' publishers designed to drive consumers to one of Defendants' websites:



93.     The site had a survey. Completing the survey caused a screen to display that stated "Congratulations! You won the iPhone 11 Pro! Please fill in your details on the next page to guarantee your prize! Prizes are limited, so act now!" Below this statement was a red "Continue!" Button. Clicking on the Continue button took the user to campaign.datebupic.net, a website operated by Defendants or Defendants' publishers designed to drive consumers to one of Defendants' websites:



94.     The user clicked the back navigation button in the user's Internet browser and was directed automatically and instantaneously through intermediary domains, including go.cologyle.com, to land on neotericsalve.club, a website operated by Defendants or Defendants' publishers designed to drive consumers to one of Defendants' websites:



95.     The user scrolled down and selected a green "Choose" button and was presented with a purported opportunity to claim a $1000 Walmart gift card by clicking a button stating "Claim your prize." Clicking the button caused the browser to navigate automatically and instantaneously through intermediary domains, including track.humblefriend.com and silver.hairy-cactus.com, and land on promotionsonlineusa.com, a Reward Zone website that displayed the same $1000 Walmart gift card offer:



96.     On May 19, 2020, 11:40 a.m., Johnson's phone number ending in 8330 received the following text from Defendants and/or their third-party publishers from the number purporting to be (530) 680-7713: "Demya, here is your $1000 from Walmart to thank our customers! Fill in your details to receive the voucher immediately imgmg.info/nNfZDX8CrX."

97.     At or around the time the text message was sent, clicking on the link caused one's smartphone to open an Internet browser page and navigate automatically and instantaneously through intermediary domains, including imgmg.info, bszyd.rdtk.io, and land on rmgmg.info, a website operated by Defendants or Defendants' publishers designed to drive consumers to one of Defendants' websites:



98.     After completing a survey, selecting a $500 Walmart gift card "reward," and clicking a button saying "continue," the user's Internet browser navigated through intermediary domains, including bszyd.rdtk.io, and landed on campaign.budgettagger.com, a website operated by Defendants or Defendants' publishers designed to drive consumers to one of Defendants' websites:



99.     Selecting the back button on the user's Internet browser caused the browser to navigate through go.vavnickbe.com to rewardsprogram.todaysnewcustom.com, a website operated by Defendants or Defendants' publishers designed to drive consumers to one of Defendants' websites:



100.    The Taylor comment appears on the landing page, and a "minimum" $100 value reward was offered if the user took a survey. Selecting the back button on the Internet browser directed the browser to bigprizeclaim.com, a website operated by Defendants or Defendants' publishers designed to drive consumers to one of Defendants' websites:



101.    The site automatically spins the wheel and lands on spin again. On the second spin, the user was told the user won a Wells Fargo gift card and to "Claim now." Selecting the "Claim Now" button directed the user to promotionsonlineusa.com, a Reward Zone website that included the same $1000 Wells Fargo Gift Card offer:





102.    On September 2, 2020, at 4:23 p.m., Johnson's phone number ending in 8330 received the following text from Defendants and/or their third-party publishers from the number purporting to be (478) 246-3692: "DeMya Johnson, urgent notification about the USPS delivery A56A5 from 08/12/2020. Click: l8smk.info/GpHBnlfX0D."

103.    At around the time the text message was sent, clicking on the link in the text message caused the user's Internet browser to automatically open and navigate instantaneously through intermediary domains, including l8smk.info, jruzd.rdtk.io, go.hometeket.com, and land on rewardsprogram.daooftoday.com, a website operated by Defendants or Defendants' publishers designed to drive consumers to one of Defendants' websites::



104. The Taylor comment was again featured on this website. The user was promised a special reward for answering a few questions. The user selected the back button on the Internet browser and was directed to werewardus.com, a website operated by Defendants or Defendants' publishers designed to drive consumers to one of Defendants' websites:



105.    Werewardus.com contained a prize wheel that automatically spun and landed on spin again once the page loaded. A popup window opened, the user selected close, and the wheel spun again, this time landing on a 1000 Amazon gift card:



106.     The user selected the claim now button and the browser was automatically directed

to promotionsonlineusa.com, a Reward Zone website that included the same $1,000 Amazon Gift

Card offer:



107.    In response to the September 2, 2020 text, Johnson replied STOP.

108.    On November 30 2020, at 9:24 a.m., Johnson's phone number ending in 8330 received the following text from Defendants and/or their third-party publishers from the number purporting to be (803) 307-9554: "Dear Demya, Y0UR ZANTAC PAY0UT: Collect You're Settlement Before Deadline 0n l2/04!: fz8c.info/jH7rJ46tCl."

109.    At or around the time the text message was sent, clicking on the link caused one's smartphone to open an Internet browser page, navigate automatically and instantaneously through intermediary domains, including fz8c.info, ltitrk.com, and land on benefits.benefit-relief.com, a

website operated by Defendants or Defendants' publishers designed to drive consumers to one of Defendants' websites:



110.    The user was asked a series of yes or no questions that were answered. The user then selected a $750 Cash App gift card from a purported list of rewards, and the browser was direct to surveysandpromoonline.com, a Reward Zone website that displayed the same $750 Cash App gift card offer:



111.    In response to the November 30, 2020 text, Johnson again replied STOP.

112.    On December 23, 2020, at 11:28 a.m., Johnson's phone number ending in 8330 received the following text from Defendants and/or their third-party publishers from the number purporting to be (803) 686-4049: "Thank you for being a loyal customer and paying your last months bill on time during these hard times, you deserve this jjmhb.me/wnNUm9zX4B."

113.    At or around the time the text message was sent, clicking on the link caused one's smartphone to open an Internet browser page, navigate automatically and instantaneously through intermediary domains, including jjmhb.me, torilaty.com, sorisy.com, go.bosquinte.com, and land

on cloud-inbox.online, a website operated by Defendants or Defendants' publishers designed to drive consumers to one of Defendants' websites:



114.    The user completed the 7-question survey and the site presented a Christmas-themed "mini-game" in which the user was told that she won an iPad:



115.    After clicking on the continue button, the user was directed through intermediary domains, including safesecurecvr.com and batnstrk.com, to chancetowins.com, a website operated by Defendants or Defendants' publishers designed to drive consumers to one of Defendants' websites:



116. The user selected the back button several times in the browser navigation panel and was directed through the cloud-inbox.online website to instantprizewinner.com, a website operated by Defendants or Defendants' publishers designed to drive consumers to one of Defendants' websites:



117.    On instantprizewinner.com, the top comment purports to be from Alex Fabian (the

"Fabian comment"). The prize wheel on this website automatically began to spin once the page

loaded and landed on spin again. The second spin landed on a $750 Amazon gift card:



118.    The user selected "Claim Now" and was directed to retailproductsusa.com, a Reward Zone website that displayed the same $750 Amazon Gift Card offer:



119.    In response to the December 23, 2020 text, Johnson again replied STOP.

120.    On December 24, 2020, at 10:08 a.m., Johnson's phone number ending in 8330 received the following text from Defendants and/or their third-party publishers from the number purporting to be (214) 435-0037: "Thank you for being a loyal customer and paying your last months bill on time during these hard times, you deserve this gift psoti.me/09vXGz3hP5."

121.    At or around the time the text message was sent, clicking on the link caused one's smartphone to open an Internet browser page, navigate automatically to cloud-inbox.online, a website operated by Defendants or Defendants' publishers designed to drive consumers to one of Defendants' websites, where the user completed a survey and was told she won an iPad. After

selecting the back navigation button several times, the user was directed to rewardstocollect.com, a website operated by Defendants or Defendants' publishers designed to drive consumers to one of Defendants' websites that included a prize wheel and a reward of a $1000 Walmart gift card in the same manner as alleged previously:



122.    The user selected the claim your prize button and was directed to promotionsonlineusa.com, a Reward Zone website that displayed the same $1000 Walmart Gift Card:



123.    In response to the December 24, 2020 text, Johnson again replied STOP.

124.    On March 15, 2021, 10:58 a.m., Johnson's phone number ending in 8330 received the following text from Defendants and/or their third-party publishers from the number purporting to be (631) 310-7171: "ZANTAC NOTICE: We know you have used Zantac before and we are filing for classactions Secure your settlement and get your payout ASAP muov9.xyz/UQN0lw8zWd."

125.    At or around the time the text message was sent, clicking on the link caused one's smartphone to open an Internet browser page, navigate automatically to Benefits.benefit-

relief.com, a website operated by Defendants or Defendants' publishers designed to drive consumers to one of Defendants' websites.

126.    The user completed a survey and claimed the $750 Cash App gift card as a "reward."



127.    Selecting the gift card caused the user's browser to navigate to surveysandpromoonline.com, a Reward Zone website that displayed the same $750 Cash App Reward:



128.    In response to the March 15, 2021 text, Johnson again replied STOP.

129.    On March 22, 2021, at 7:43 a.m., Johnson's phone number ending in 8330 received the following text from Defendants and/or their third-party publishers rom the number purporting to be (214) 914-9290: "Zntac has paid you ! Transaction Successful. Demya You have 24hrs to collect your payout. Collect it immediately peko.xyz/oX6lyDmjnX."

130.    At or around the time the text message was sent, clicking on the link caused one's smartphone to open an Internet browser page, navigate automatically and instantaneously through intermediary domains peko3.xyz, track.fateselection.com, track.albancarrier.com, lintwor.com

and land on benefits.legalactionfinder.com, a website operated by Defendants or Defendants'
publishers designed to drive consumers to one of Defendants' websites:



131.    After the user competed a survey, the user was offered a list of rewards. The user
selected the $750 Cash App gift card:



132.   Upon selecting the "Get Rewarded" button, the user was directed to surveysandpromoonline.com, a Reward Zone website that displayed the same $750 Cash App offer:



133.    In response to the March 22, 2021 text, Johnson again replied STOP.

134.    On April 12, 2021, at 8:35 a.m., Johnson's phone number ending in 8330 received the following text from Defendants and/or their third-party publishers from the number purporting to be (619) 854-0838: "Hello Demya, your CVS voucher (ID #004tj2j) expired today. (179USD) You can still redeem 90% of the value if you now. mjpf3.xyz/9LrfgmT7m."

135.    At or around the time the text message was sent, clicking on the link caused one's smartphone to open an Internet browser page, navigate automatically and instantaneously through intermediaries, including mjpf3.xyz, track.lilbadoony.com, track.albancarrier.com, fiascors.com

and land on homeinfoclub.com, a website operated by Defendants or Defendants' publishers designed to drive consumers to one of Defendants' websites:



136.    After selecting the back navigation button on the Internet browser, the user was directed to sidepromo.com, a website operated by Defendants or Defendants' publishers designed to drive consumers to one of Defendants' websites:



137.    The pop up window stated "National Consumer Center would like to thank you for your loyalty today." National Consumer Center is a business name used by Defendants. *See In re Fluent*, Assurance No. 21-027, ¶ 11.

138.    The sidepromo.com website includes a prize wheel. After two spins, the first landed on spin again, and the second landed on a $750 Cash App gift card. Claiming the "reward" directed the user through secondpromo.com, x.skytrackerz.com, and c.spinccrzone.com, to surveysandpromoonline.com, a Reward Zone website that displayed the same $750 Cash App gift card offer:



139.    In response to the April 12, 2021 text, Johnson again replied STOP.

140.    On April 13, 2021, at 6:46 a.m., Johnson's phone number ending in 8330 received the following text from Defendants and/or their third-party publishers from the number purporting to be (323) 541-7897: "PAYMENT Successful: Zntac has paid you Transaction ready. Demya You have 24hrs to collect your payout. Collect it immediately iwng7.xyz/s1OQQfiAJu."

141.    At or around the time the text message was sent, clicking on the link caused one's smartphone to open an Internet browser page, navigate automatically and instantaneously through intermediaries, including iwng7.xyz, track.lilbadoony.com, track.albancarrier.com, fiascors.com,

and land on benefits.legalactionfinder.com, a website operated by Defendants or Defendants'
publishers designed to drive consumers to one of Defendants' websites:



142.    After completing a survey and selecting a purported reward for a $750 Cash App
gift card, the user was directed through intermediaries welpdergo.com, tlctrck.com,
spnccrzone.com and landed on surveysandpromoonline.com, a Reward Zone website that
displayed the same $750 Cash App gift card offer:



143.    In response to the April 13, 2021 text, Johnson again replied STOP.

144.    On April 16, 2021, at 7:05 a.m., Johnson's phone number ending in 8330 received the following text from Defendants and/or their third-party publishers from the number purporting to be (619) 705-8804: "-Settlement finalized- a Zntac settlement has been confirmed. Compensation pool of 1.2BN USD Demya apply now to receive your share hkgf2.xyz/aJG7cUD6l7."

145.    At or around the time the text message was sent, clicking on the link caused one's smartphone to open an Internet browser page, navigate automatically and instantaneously through intermediaries, including track.lilbadoony.com, track.albancarrier.com, fiascors.com, and land on benefits.legalactionfinder.com, a website operated by Defendants or one of Defendants' third-party publishers designed to drive the consumer to one of Defendants' websites:



146.    After completing a survey and selecting a purported reward for a $750 Cash App gift card, the user was directed through intermediaries welpdergo.com, tlctrck.com, spnccrzone.com and landed on surveysandpromoonline.com, a Reward Zone website that displayed the same $750 Cash App gift card offer:



147.    In response to the April 16, 2021 text, Johnson again replied STOP.

148.    On April 22, 2021, at 2:03 p.m., Johnson's phone number ending in 8330 received the following text from Defendants and/or their third-party publishers from the number purporting to be (972) 742-1016: "AMAZON PAYMENT: We have added 149 USD to your virtual account! Your updated balance can be found here: ljbf9.xyz/Um9PlxoZv7."

149.    At or around the time the text message was sent, clicking on the link caused one's smartphone to open an Internet browser page, navigate automatically and instantaneously through intermediaries  track.fateselection.com,  track.albancarrier.com,  go.soluzahoy.com,  and  land  on

usmygiftalidda.xyz, a website operated by Defendants or one of Defendants' third-party publishers designed to drive the consumer to one of Defendants' websites:



150.    The user clicked on the back button on the Internet browser, which navigated automatically and instantaneously through intermediary go.gunthic.com and landed on rewards4claim.net, a website operated by Defendants or Defendants' publishers designed to drive consumers to one of Defendants' websites:



151.    When the user clicked the "Get Started" button, the user was immediately directed to promotionsonlineusa.com, a Reward Zone website that displayed the same $1,000 Amazon Gift Card offer:



152.    In response to the April 22, 2021 text, Johnson again replied STOP.

153.    On April 26, 2021, at 5:46 a.m., Johnson's phone number ending in 8330 received the following text from Defendants and/or their third-party publishers from Defendants and/or their third-party publishers from the number purporting to be (302) 563-5953: "PAYOUT APPROVED! Demya we are happy to let you know that your compensation is available upon request: jlbl4.xyz/rfrASZo9dl."

154.    At or around the time the text message was sent, clicking on the link caused one's smartphone to open an Internet browser page, navigate automatically and instantaneously through intermediaries, including jlbl4.xyz, track.lilbadoony.com, track.albancarrier.com, shiboar.com, and land on benefits.legalactionfinder.com, a website operated by Defendants or Defendants'

publishers designed to drive consumers to one of Defendants' websites, which is depicted in paragraph 146, *supra*.

155.    Selecting the $750 Cash App gift card "reward" for completing the survey caused the user's Internet browser to be directed through welpdergo.com, tlctrck.com, spnccrzone.com, and land on surveysandpromoonline.com, a Reward Zone website:



156.    In response to the April 26, 2021 text, Johnson again replied STOP.

157.    On May 21, 2021, at 6:18 a.m., Johnson's phone number ending in 8330 received the following text from Defendants and/or their third-party publishers from the number purporting

to be (718) 207-7576: "AHR Has paid you Demya. Your payout has been accepted by American

Hope Resources! Check how much you will be paid here: vwgu9.xyz/mvNtWfk0lc."

    158.    At or around the time the text message was sent, clicking on the link caused one's

smartphone to open an Internet browser page, navigate automatically and instantaneously through

intermediaries, including track.lilbadoony.com and track.albancarrier.com, and land on

benefits.americanhoperesources.com, a website operated by Defendants or Defendants' publishers

designed to drive consumers to one of Defendants' websites:



    159.    After completing a survey and selecting a purported benefit of a $1000 Assistance

Check for "Hard Times", the user was directed through intermediaries hardshipbenefits.guide,

hockian.com, c.tlctrck.com, c.spnccrzone.com, rewardsgiantusa.com, t.therewardboost.com, and

landed on displayoptoffers.com, a Reward Zone website:



160.    In response to the May 21, 2021 text, Johnson again replied STOP.

161.    On May 22, 2021, at 7:54 a.m., Johnson's phone number ending in 8330 received the following text from Defendants and/or their third-party publishers from the number purporting to be (239) 216-7933: "Hey Demya its Cassidy from Walmart Guess what? The unique code 2851 printed on your receipt from Last Month came 1st! evjh2.xyz/rjMhWjhAqH."

162.    At or around the time the text message was sent, clicking on the link caused one's smartphone to open an Internet browser page, navigate automatically and instantaneously through intermediaries, including evjh2.xyz, track.fateselection.com, track.albancarrier.com, and land on

members.mobile-rewards.online, a website operated by Defendants or Defendants' publishers designed to drive consumers to one of Defendants' websites:



163. The user completed a 7-question survey and was offered a gift of wireless ear pods. The user selected the back navigation button on the Internet browser and was directed to rewards4claim.net, a website operated by Defendants or Defendants' publishers designed to drive consumers to one of Defendants' websites



164.    After completing the survey, the user was told a $1000 gift card was reserved for

her:



165.    The user selected the Walmart gift card and immediately was directed through f.natnlcsmrcntr.com to promotionsonlineusa.com, a Reward Zone website, where the same or similar $1000 Walmart gift card offer was displayed:





166.    In response to the May 22, 2021 text, Johnson again replied STOP.

167.    On June 1, 2021, at 5:27 a.m., Johnson's phone number ending in 8330 received the following text from Defendants and/or their third-party publishers from the number purporting to be (913) 645-1676: "HI Demya Why haven't you activated your $199 Walmart giftcard printed on your receipt on 02/10? It expires in 24 hrs. Activate now: 2negsqf.lagv3.xyz/AZir."

168.    At or around the time the text message was sent, clicking on the link caused one's smartphone to open an Internet browser page, navigate automatically and instantaneously through intermediaries,   including   track.fateselection.com,   track.albancarrier.com,   2negsqf.lagv3.xyz,

go.madpote.com, and land on luckywinnersgo.com, a website operated by Defendants or Defendants' publishers designed to drive consumers to one of Defendants' websites:



169.    The user responded to survey questions, was told she qualified get an Apple iPad Pro, and selected continue. She was directed to a different website. She selected the back navigation button on her Internet browser several times and was taken from that website to luckywinnersgo.com, a website operated by Defendants or Defendants' publishers designed to drive consumers to one of Defendants' websites, and then directly to electronicpromotionsusa.com, a Reward Zone website:





170.    In response to the June 1, 2021 text, Johnson again replied STOP.

171.    Defendants and their publishers did not obtain Johnson's prior express consent before sending these text messages.

172.    Defendants unlawfully continued to text Johnson after Johnson replied STOP.

173.    Defendants continue to unlawfully send text messages to Johnson despite her numerous requests that the text messages cease.

174.    Defendants unlawfully texted Johnson outside permissible hours.

*Plaintiff Allison Powers*

119.    On October 29, 2020, at 6:43 p.m., Powers' phone number ending in 9718 received the following text from Defendants and/or their third-party publishers purportedly from the number (332) 234-2199: "FEDEX – shipment 15358 notification: shipped.   Review> f3gcv.info/2H2Lu39ZAP."

120.    At or around the time the text message was sent, clicking on the link caused one's smartphone to open an Internet browser page, navigate automatically and instantaneously through intermediaries, including f3gcv.info, jtuzd.rdtk.io, go.heliminage.com, and land on angelprize.com, a website operated by Defendants or Defendants' publishers designed to drive consumers to one of Defendants' websites:



121.    The user responded to some questions and was told she won a Sony Playstation 5. The user selected claim now button and was taken to winprizes.today, a website operated by Defendants or Defendants' publishers designed to drive consumers to one of Defendants' websites. Then, the user selected the back navigation button on her Internet browser several times, which took her back to angelprize.com where she first landed, then to dailygiftonline.com, a website operated by Defendants or Defendants' publishers designed to drive consumers to one of Defendants' websites:



122.    On this site, the top comment is the Fabian comment. The first spin started automatically once the page loaded and landed on spin again. After a pop up box was closed, the second spin landed on the $750 Venmo gift card. The user claimed the gift card and her Internet browser was directed to promotionsonlineus.com, a Reward Zone website:



123.    Defendants did not obtain Powers' prior express consent before sending this text message.

**<u>DEFENDANTS' LIABILITY FOR THE TELEMARKETING TEXT MESSAGES</u>**

124.    Defendants and their publishers failed to obtain prior express consent—written or otherwise—to send the texts alleged above. Prior express written consent is required for telemarketing text messages. Prior express written consent is defined as:

> [A]n agreement in writing, bearing the signature of the person called that clearly authorized the seller to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice, and the

telephone number to which the signatory authorizes such advertisement or telemarketing messages to be delivered.

47 C.F.R. § 64.1200(f)(9).

125.    Defendants and their publishers used an ATDS, as that term is defined under 47 U.S.C. § 227(a)(1), when they sent the robotexts to Plaintiffs and the Class members.

126.    Defendants, through their own acts and through persons whose acts are attributed and imputed to Defendants, such as their publishers, including through principles of direct liability and vicarious liability, used equipment which has the "capacity to use a random or sequential number generator to either store or produce phone numbers to be called." *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163, 1173 (2021).

127.    Defendants sent the text messages using messaging platforms capable of transmitting thousands of automated text messages without any human involvement. The text message platforms used by Defendants had and have the present capacity and actually were used in one or more of the following ways: (1) to use a random or sequential number generator to produce telephone numbers to be dialed automatically; (2) to use a random or sequential number generator to store telephone numbers in the platform's database to be dialed at later time automatically; (3) to use a random or sequential number generator to select the order and frequency in which telephone numbers are dialed; and (4) to generate telephone numbers in a sequential order and, through an automated process, combine prerecorded text message content with the telephone number and deliver such text messages in sequential order.

128.    47 C.F.R. § 64.1200(c)(1) prohibits telephone solicitations before 8:00 a.m. or after 9:00 p.m. local time.

129.    Defendants repeatedly violated this rule as to Plaintiffs and Class members.

130.    47 C.F.R. § 64.1200(c)(2) prohibits telephone solicitations to telephone numbers on the National Do Not Call Registry.

131.    Defendants repeatedly violated this rule as to Plaintiffs and Class members.

132.    Text messages, such as the ones made by Defendants, are subject to the TCPA. *See* Fed. Commc'ns Comm., Enforcement Advisory No. 2016-06, DA 16-1299, *Robotext Consumer Protection: Text Message Senders Must Comply With the Telephone Consumer Protection Act* (Nov. 18, 2016).

133.    Defendants are liable for each of the TCPA-violating text messages under one or more of the following theories of liability: (1) Direct Liability, (2) Actual Authority, (3) Apparent Authority, (4) Ratification, (5) Joint Enterprise, (6) Acting in Concert, and (7) "On Behalf Of" Liability.

## DIRECT LIABILITY

134.    Defendants' scheme involves the use of unlawful robotexting of advertising and promotional offers, as alleged herein, to advance their pecuniary or business interests.

135.    Defendants directly initiated the unlawful robotexts to Plaintiffs and Class members and are directly liable for violating the TCPA.

136.    The robotexts sent to Plaintiffs and Class members contained hyperlinks that either directly or indirectly, connected consumers' cellular telephones to Defendants' websites. All of the robotexts alleged herein were sent to Plaintiffs and Class members in order to drive the consumer to one of Defendants' websites.

137.    Defendants initiated and made the text messages, so they are directly liable for their transmission to Plaintiffs and Class members.

## <u>ACTUAL AUTHORITY</u>

138.    The TCPA incorporates federal common law agency principles.

139.    To the extent Defendants outsource the act of executing the unlawful robotexts to third parties, such as their publishers, such an act would not and does not absolve them from liability under the TCPA.

140.    On May 9, 2013, the FCC confirmed this principle in a Declaratory Ruling holding that sellers may not avoid liability by outsourcing telemarketing:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment, limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain effective relief. As the FTC noted, because "[s]ellers may have thousands of 'independent' marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy."

*In the Matter of the Joint Petition Filed by Dish Network, LLC, the United States of Am., & the States of California, Illinois. N. Carolina, & Ohio for Declaratory Ruling Concerning the Tel. Consumer Prot. Act (TCPA) Rules*, 28 F.C.C. Rcd. 6574, 6588 (F.C.C. 2013) ("*Dish Network*").

141.    Defendants signed contracts with each other and with third parties, including their publishers, expressly authorizing and directing them to promote Defendants' websites and Defendants' clients' goods and services in accordance with specifications largely dictated by Defendants, but with certain unimportant or obvious aspects of the conduct unspoken.

142.    For example, Defendants may not have had control over the list of persons to whom texts would be sent and certain content of the messages. However, Defendants did not have to specify or direct their agents to send communications by text message because they were engaged in the business of sending such text messages to consumers to generate leads.

143.    By signing contracts that made these entities or persons authorized agents of Defendants—expressly or impliedly—to execute unlawful robotexts to Plaintiffs and Class members and to convey hyperlinks that linked directly to Defendants' websites or to one or more websites that were designed to drive traffic to one of Defendants' websites, Defendants are liable for violations of the TCPA.

144.    For the important details of the transactions, such as what website(s) to hyperlink to and what offer would be presented on such website (so that the third party could present a seamless, matching offer on their website(s) designed to drive the consumer to Defendants' websites), Defendants had control over the publishers, but the publishers may have had a range of discretion in deciding how to carry out the campaigns.

145.    That discretion was necessarily limited by implication, including the publishers' economic incentive being tied to the open rate of text messages, their business, and shared knowledge by them and Defendants regarding what methods most effectively increase the open rates of text messages.

146.    Indeed, the FCC acknowledges that vicarious liability is imposed where the caller is "unsupervised." 28 F.C.C. Rcd. at 6588.

147.    During all relevant times, and as admitted in Defendants' SEC filings, Defendants knew that publishers were engaged in marketing practices constituting unlawful text messaging to

direct traffic to Defendants' websites and Defendants' clients' products or services, in accordance with the specifications and contractual provisions agreed to by Defendants and the publishers.

148.    Defendants accepted, did not object to, and benefitted from the publishers' violations of the TCPA.

149.    Defendants directed and controlled the conduct of the publishers by, *inter alia*, establishing and enforcing guidelines and specifications of their activities on behalf of Defendants, retaining rights to modify, amend, or withdraw the authority to act on behalf of Defendants in sending the unlawful text messages, compensating them for engaging in conduct that violated the TCPA, knowing that the publishers engaged in conduct that violated the TCPA, consciously disregarding the risk publishers were violating the TCPA, and taking steps to avoid such knowledge, instructing publishers, impliedly or expressly, not to disclose information that, if known by Defendants, would establish Defendants' knowledge that the publishers were engaged in conduct violating the TCPA, and providing feedback to the publishers regarding changes in practices.

150.    Due to the anonymous nature of text messaging and the multitude of websites used by Defendants and their publishers designed to drive the consumers to Defendants' websites, Plaintiffs have no access to information to identify the exact relationship between Defendants and their publishers, who are the anonymous public facing arm of Defendants' unlawful lead generation text messaging scheme.

151.    However, Plaintiffs are not required to know this information at the pleading stage. *Dish Network* states that called parties may obtain "evidence of these kinds of relationships . . . through discovery, if they are not independently privy to such information." 28 F.C.C. Rcd., at 6592–93 (¶ 46).

## APPARENT AUTHORITY

152.   *Dish Network* further clarifies the circumstances under which a telemarketer has apparent authority:

> [A]pparent authority may be supported by evidence that the seller allows the [third party] access to information and systems that normally would be within the seller's exclusive control, including: access to detailed information regarding the nature and pricing of the seller's products and services or to the seller's customer information. The ability by the outside sales entity to enter consumer information into the seller's sales or customer systems, as well as the authority to use the seller's trade name, trademark and service mark may also be relevant. It may also be persuasive that the seller approved, wrote or reviewed the outside entity's telemarketing scripts. Finally, a seller would be responsible under the TCPA for the unauthorized conduct of a third-party telemarketer that is otherwise authorized to market on the seller's behalf if the seller knew (or reasonably should have known) that the telemarketer was violating the TCPA on the seller's behalf and the seller failed to take effective steps within its power to force the telemarketer to cease that conduct.

> 28 FCC Rcd. at 6592 (¶ 46).

153.   The integration of Defendants' websites—the websites operated by one or more of Defendants' publishers designed to drive the consumer to Defendants' websites with the text messages used by the publishers—was so seamless that it appeared to Plaintiffs that Defendants and the publishers were acting together as the same company.

154.   In many instances, Plaintiffs navigated to Defendants' websites by using their Internet browser back button to go back from the landing pages contained in the text message hyperlinks, illustrating a high-degree of interconnectedness between the websites that served as landing pages and Defendants' websites.

155.   In addition, all of the text messages sent to Plaintiffs have Defendants' websites in common, as well as substantial similarities in tactics, *e.g.*, the Taylor comment, prize wheel

websites with the same two-spin progression, and the ultimate offer to claim a valuable gift card that directed Plaintiffs to Defendants' websites, indicates Defendants' involvement as the central hub and overseer of the scheme and the ones who benefit from all of these text messages.

156.    Defendants allowed the publishers to enter consumer information into their systems as well as to use Defendants' website links, URLs, and website content to send to consumers.

157.    For example, in many instances, websites presented to Plaintiffs contained the same offer or reward on their websites as Defendants, and clicking on the websites to claim the reward sent Plaintiffs to Defendants' websites.

158.    Defendants gave the publishers the authority to use their websites, hyperlinks, URLs, trade name, trademark, service mark, forms, contracts, and materials.

159.    The publishers did not independently identify themselves to Plaintiffs and the other Class members or provide their contact information.

160.    Instead, at times the publishers masqueraded as other actors, such as USPS or Amazon, to induce and trick recipients to click on the hyperlink contained in the text message.

## RATIFICATION

161.    Defendants knowingly and actively accepted business and contacts with consumers that originated through TCPA-violating text messages placed by Defendants' publishers.

162.    Defendants ratified publishers' TCPA violations by knowingly accepting the benefit of new contacts with consumers despite the fact that these consumers were generated through conduct that violates the TCPA.

163.    Alternatively, Defendants ratified their publishers' TCPA violations by knowing facts that would cause an ordinarily prudent person to inquire as to whether the publishers were violating the TCPA, or create a reasonable suspicion that their publishers do not comply with the

TCPA, willfully turning a blind eye to those facts, and accepting the benefit of new consumer contacts despite the fact that they were generated through conduct that violates the TCPA.

164.    Defendants ratified the TCPA violations of their publishers by being willfully ignorant of the violations or by being aware that such knowledge was lacking and accepting the benefits of the TCPA violations.

165.    Defendants have received numerous complaints regarding the conduct of the entities that send text messages on their behalf, and Defendants refuse to alter their business practices in response to the complaints of unlawful conduct.

166.    Defendants knew that their publishers engaged in conduct that violated the TCPA and generated numerous consumer complaints because of their telemarketing practices, but failed to terminate their relationship with the publishers and continued to do business with them.

167.    In the words of Fluent's General Counsel, Daniel Barsky, "It's important to understand how the backend really works, who is doing what, where the risks are and who should be responsible for that risk."[1]

168.    In addition, Fluent acknowledges on page 19 of its 2020 Annual Report that publishers "may use unapproved marketing channels, such as SMS, to drive users to our sites, which may expose us to liability under the TCPA," and that Fluent "could be seen as responsible for this behavior."

169.    On January 28, 2020, Fluent was served with a Civil Investigative Demand from the Federal Trade Commission regarding "compliance with the FTC Act and the TSR [Telemarketing Sales Rule], as they relate to the advertising, marketing, promotion, offering for

---

[1] https://www.vanguardlawmag.com/case-studies/dan-barsky-fluent-inc/ (last visited, May 24, 2021).

sale, or sale of rewards and other products, the transmission of commercial text messages, and/or consumer privacy or data security." Fluent 2020 Annual Report, page 8.

## JOINT ENTERPRISE

170.   Defendants and their publishers had a tacit agreement, or approved of after the fact, for the marketing of Defendants' services and Defendants' clients' produced by means that violate the TCPA, including sending unsolicited text messages to numbers registered on the National Do Not Call Registry and to cellular or other phone numbers using an ATDS, all without obtaining prior express consent to engage in such conduct.

171.   Defendants and their publishers were part of a common enterprise and had a community of interest in marketing and promoting Defendants' websites, services, and products and the products of Defendants' clients.

172.   Defendants and their publishers had an equal right to control the conduct thereof by specifying the type of people to be texted, when to text, and what to say in the text messages.

173.   Defendants and their publishers entered into an agreement on how the proceeds of the unlawful activities would be apportioned among them.

174.   Defendants their publishers are jointly and severally liable for the resulting damage caused by their publishers' TCPA-violating conduct.

## ACTING IN CONCERT

175.   Defendants acted in concert with their publishers when they sent text messages in violation of the TCPA, as alleged herein.

176.   Defendants received the benefit of the consumer contacts generated by their publishers.

177.    Defendants compensated their publishers for engaging in conduct that violated the TCPA.

178.    Defendants and their publishers agreed and were part of a common design to text consumers in order to generate business and consumer contacts.

179.    Defendants had a tacit understanding that their publishers would engage in telemarketing activity that violated the TCPA.

180.    Defendants knew that their publishers' conduct was a breach of duty to Plaintiffs.

181.    Defendants gave their publishers substantial assistance in accomplishing the tortious result, including compensating their publishers for generating respondents pursuant to unsolicited text messages and giving instructions on the content, timing, direction, volume, and manner of the text messaging activities.

182.    Defendants furthered the tortious conduct by their cooperation, and lending aid to their publishers, and adopting their publishers' actions for their own benefit.

183.    Defendants' own conduct constitutes a breach of duty to Plaintiffs.

184.    Each Plaintiff's injury is indivisible.

185.    Defendants acted tortiously, and the harm resulted from the text messages by Defendants and their publishers.

186.    Defendants are all jointly and severally liable for the resulting damage caused by their publishers.

## **"ON BEHALF OF" LIABILITY**

187.    Section 227(c)(5) of the TCPA specifies that a person who has received more than one telephone call within any 12-month period "by or on behalf of the same entity" in violation of

the regulations promulgated by the Federal Communications Commission may bring an action based on such violation to enjoin further calls or recover damages.

188.     Defendants' publishers sent text messages on behalf of Defendants in violation of the FCC's regulations, under 47 C.F.R. § 64.1200, to each Plaintiff.

## CLASS ALLEGATIONS

189.     **The 47 U.S.C. § 227(b) Class ("227(b) Class")**: All Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23, on behalf of a nationwide class of similarly situated individuals defined as follows:

> All persons in the United States to whose telephone number Defendants or a third party acting on Defendants' behalf placed one or more text messages using an automatic telephone dialing system.

190.     **The 47 U.S.C. § 227(c) Class ("227(c) Class")**: Plaintiffs Cody Pepper, Bryant, Hudson, and Johnson bring this action pursuant to Fed. R. Civ. P. 23 on behalf of a nationwide class of similarly situated individuals defined as follows:

> All persons in the United States to whose telephone number Defendants or a third party acting on Defendants' behalf placed more than one text message within a 12-month period in which the text message was sent to a telephone number registered with the National Do Not Call Registry at the time of the text message.

191.     **The North Carolina DNC Class**: Plaintiff Powers brings this action pursuant to Fed. R. Civ. P. 23 on behalf of the following North Carolina class of similarly situated individuals:

> All persons in North Carolina to whose telephone number Defendants or a third party acting on Defendants' behalf placed one or more text messages in which the text message was sent to a telephone number registered with the National Do Not Call Registry at the time of the text message.

192.     **The North Carolina Telemarketing Class:** Plaintiff Powers brings this action pursuant to Fed. R. Civ. P. 23 on behalf of the following North Carolina class of similarly situated individuals:

> All persons in North Carolina to whose telephone number Defendants or a third party acting on Defendants' behalf placed one or more text messages in which the text message did not clearly state the identity of the telephone solicitor and/or identify the individual making the telephone solicitation.

193. **The Texas Telemarketing Class**: Plaintiffs Terri Pepper, Bryant, and Hudson bring this action pursuant to Fed. R. Civ. P. 23 on behalf of the following Texas class of similarly situated individuals:

> All persons in Texas to whose telephone number Defendants or a third party acting on Defendants' behalf placed one or more text messages in which the text message did not clearly state the identity of the telephone solicitor and/or identify the individual making the telephone solicitation and/or state the purpose of the call.

194. **The Washington Commercial Text Class**: Plaintiff Cody Pepper brings this action pursuant to Fed. R. Civ. P. 23 on behalf of the following Washington class of similarly situated individuals:

> All persons in Washington to whose cellular telephone number Defendants or a third party acting on Defendants' behalf placed one or more commercial text messages without the person's clear and affirmative consent in advance.

195. **The Washington Telemarketing Class**: Plaintiff Cody Pepper brings this action pursuant to Fed. R. Civ. P. 23 on behalf of the following Washington class of similarly situated individuals:

> All persons in Washington to whose telephone number Defendants or a third party acting on Defendants' behalf placed one or more text messages in which the text message did not clearly state the identity of the telephone solicitor and/or identify the individual making the telephone solicitation and/or state the purpose of the call.

196. Excluded from the Classes are: (1) Defendants, Defendants' agents, subsidiaries, parents, successors, predecessors, and any entity in which Defendants or their parents have a controlling interest, and those entities' current and former employees, officers, and directors; (2)

the Judge to whom this case is assigned and the Judge's immediate family; (3) any person who executes and files a timely request for exclusion from the particular Class; (4) any persons who have had their claims in this matter finally adjudicated and/or otherwise released; and (5) the legal representatives, successors and assigns of any such excluded person.

197.    **Numerosity**: Upon information and belief, the Classes are comprised of tens of thousands of Class members.

198.    Thus, the Classes are so numerous that joinder of all members is impracticable.

199.    While only Defendants know the precise number and identity of Class members, according to Fluent's Annual Report for 2020, it employs text messaging campaigns to attract consumers to its digital properties "at scale" and 90% of consumers engaged with Fluent's "media on their mobile device or tablet." Annual Report, at p. 1, 18.

200.    Fluent is also currently in the midst of expanding its usage of text messaging. *Id*. at p. 18. Class members can easily be identified through Defendants' records, or by other means.

201.    **Commonality and Predominance**: There are several questions of law and fact common to the claims of Plaintiffs and Class members, which predominate over any individual issues, including:

> a.    Whether, within the four years prior to the filing of this Complaint, Defendants or their agents sent any text messages to the Class members (other than a message made for emergency purposes or made with the prior express consent of the called party) to a Class member using any ATDS and prerecorded or artificial voice to any telephone number assigned to a cellular phone service;

b.      Whether, within the four years prior to the filing of this Complaint, Defendants or their agents sent text messages to the Nationwide DNC Class members without obtaining the requisite prior express consent;

c.      Whether Defendants negligently, knowingly, or willfully engaged in conduct that violated the TCPA;

d.      Whether Plaintiffs and the Class members were damaged by Defendants' violations of the TCPA, and the extent of damages for each instance in which the TCPA was violated.

202.    **Typicality**: Plaintiffs' claims are typical of the claims of members of the Classes.

203.    All claims are based on the same legal and factual issues.

204.    Each Plaintiff in the 227(b) Class received a text message from Defendants to their cellular phone number.

205.    Each Plaintiff in the 227(c) Class received at least two text messages from the Defendants to their residential cellular phone numbers within a 12-month period.

206.    **Adequacy of Representation**: Plaintiffs will fairly and adequately represent and protect the interests of the members of the Classes and have retained counsel competent and experienced in complex class actions.

207.    Plaintiffs have no interest antagonistic to those of members of the Classes and Defendants have no defenses unique to Plaintiffs.

208.    The questions of law and fact common to the proposed Classes predominate over any questions affecting only individual members of the Classes.

209.    **Superiority**: A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

210.     The expense and burden of individual litigation would make it impracticable or impossible for proposed members of the Classes to prosecute their claims individually.

211.     The trial and the litigation of Plaintiffs' claims are manageable.

**COUNT I**
**Violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227(b)**
**(On Behalf of all Plaintiffs and the 227(b)Class)**

212.     Plaintiffs incorporate by reference paragraphs 1–211 as though fully stated herein.

213.     Based on the allegations above herein, Defendants violated the TCPA, 47 U.S.C. § 227(b)(1), by placing non-emergency calls (including text messages) to the cellular telephone numbers of Plaintiffs and members of the 227(b) Class using an ATDS without obtaining prior express written consent.

214.     The foregoing acts and omissions of Defendants constitute numerous and multiple violations of the TCPA, including but not limited to each and every one of the above-cited provisions of 47 U.S.C. § 227, *et seq.*

215.     As a result of Defendants' violations of 47 U.S.C. § 227, *et seq.*, Plaintiffs and the 227(b) Class are entitled to an award of $500.00 in statutory damages for each and every violation, pursuant to 47 U.S.C. § 227(b)(3)(B).

216.     The foregoing acts and omissions of Defendants constitute numerous and multiple knowing and/or willful violations of the TCPA, including but not limited to each and every one of the above-cited provisions of 47 U.S.C. § 227, *et seq.*

217.     As a result of Defendants' knowing and/or willful violations of 47 U.S.C. § 227, *et seq.*, Plaintiffs and the 227(b) Class are entitled to an award of $1,500.00 in statutory damages for each violation of the TCPA pursuant to 47 U.S.C. § 227(b)(3)(B) and 47 U.S.C. § 227(b)(3)(C).

218.    Plaintiffs and the 227(b) Class are also entitled to and do seek injunctive relief prohibiting such conduct in the future.

## COUNT II
**Violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227(c),** *et seq.*
**(On Behalf of Plaintiffs Cody Pepper, Bryant, Hudson, and Johnson and the 227(c) Class)**

219.    Plaintiffs incorporate by reference paragraphs 1–211as though fully stated herein.

220.    Based on the allegations herein, Defendants violated the TCPA, 47 U.S.C. § 227(c) and 47 C.F.R. § 64.1200(c)(2), by placing, or having placed on their behalf, unsolicited telemarketing calls (including text messages) to the telephone numbers of Plaintiffs and members of the 227(c) Class even though those numbers were at all relevant times listed on the National Do Not Call Registry.

221.    Plaintiffs Cody Pepper, Bryant, Hudson, and Johnson and 227(c) Class members received two or more text messages from or on behalf of Defendants in a 12-month period.

222.    Plaintiffs Cody Pepper, Bryant, Hudson, and Johnson received two or more text messages from or on behalf of Defendants outside the hours of 8:00 a.m. to 9:00 p.m. local time at the called party's location.

223.    Plaintiffs Cody Pepper, Bryant, Hudson and Johnson and 227(c) Class members did not give prior express invitation, permission, or consent of any kind for Defendants or their agents to call them. Defendants and their agents had no established business relationship with Plaintiffs Cody Pepper, Bryant, Hudson, and Johnson or the other 227(c) Class members.

224.    As a result of Defendants' violations of 47 U.S.C. § 227, *et seq.*, Plaintiffs Cody Pepper, Bryant, Hudson, and Johnson and the 227(c) Class are entitled to an award of $500.00 in statutory damages, for each and every violation, pursuant to 47 U.S.C. § 227(c)(3)(B).

225.     The foregoing acts and omissions of Defendants and/or their agents constitute numerous and multiple knowing and/or willful violations of the TCPA, including but not limited to each and every one of the above-cited provisions of 47 U.S.C. § 227, *et seq*.

226.     As a result of Defendants' knowing and/or willful violations of 47 U.S.C. § 227, *et seq*., Plaintiffs Cody Pepper, Bryant, Hudson, and Johnson and the 227(c) Class members are entitled to an award of $1,500.00 in statutory damages for each violation of the TCPA pursuant to 47 U.S.C. § 227(c)(5)(B) and 47 U.S.C. § 227(c)(5)(C).

227.     Plaintiffs Cody Pepper, Bryant, Hudson, and Johnson and members of the 227(c) Class are also entitled to and do seek an injunction prohibiting Defendants and Defendants' agents from violating the TCPA, 47 U.S.C. § 227(c)(5)(A) and 47 C.F.R. § 64.1200(c)(2), by placing unsolicited telemarketing calls (including text messages) to any telephone numbers on the National Do Not Call Registry.

**COUNT III**
**Violations of N.C. Gen. Stat. § 75-102(a)**
**(On Behalf of Plaintiff Powers and the North Carolina DNC Class)**

228.     Plaintiff Powers incorporates the foregoing paragraphs 1–211 as if fully set forth herein.

229.     Defendants sent, or third parties on Defendants' behalf sent, text messages constituting telephone solicitations to Plaintiff Powers' and North Carolina DNC Class members' telephone numbers.

230.     Plaintiff Powers' and North Carolina DNC Class members' telephone numbers were all on the National Do Not Call Registry at the time of the text messages.

231.     Plaintiff Powers and North Carolina DNC Class members are entitled to an award of $500 in statutory damages for the first violation pursuant to N.C. Gen. Stat. § 75-105(b)(2).

232.    Plaintiff Powers and North Carolina DNC Class members are entitled to an award of $1,000 in statutory damages for the second violation pursuant to N.C. Gen. Stat. § 75-105(b)(2).

233.    Plaintiff Powers and North Carolina DNC Class members are entitled to an award of $5,000 in statutory damages for the third violation and any other violations that occur within two years of the first violation.

## **COUNT IV**
### **Violations of N.C. Gen. Stat. § 75-102(c)(1)**
### **(On Behalf of Plaintiff Powers and the North Carolina Telemarketing Class)**

234.    Plaintiff Powers incorporates the foregoing paragraphs 1–211 as if fully set forth herein.

235.    Defendants sent, or third parties on Defendant's behalf sent, text messages constituting telephone solicitations to Plaintiff Powers' and North Carolina Telemarketing Class members' telephone numbers.

236.    The text messages did not clearly state the identity of the telephone solicitor and identify the individual making the telephone solicitation at the beginning of the telephone solicitation in violation of N.C. Gen. Stat. § 75-102(c)(1). In many cases, the text message was written under false pretenses and falsely purported to be from an unrelated third party.

237.    Plaintiff Powers and North Carolina Telemarketing Class members are entitled to an award of $500 in statutory damages for the first violation pursuant to N.C. Gen. Stat. § 75-105(b)(2).

238.    Plaintiff Powers and North Carolina Telemarketing Class members are entitled to an award of $1,000 in statutory damages for the second violation pursuant to N.C. Gen. Stat. § 75-105(b)(2).

239.     Plaintiff Powers and North Carolina Telemarketing Class members are entitled to an award of $5,000 in statutory damages for the third violation and any other violations that occur within two years of the first violation.

**COUNT V**
**Violations of the Tex. Bus. and Comm. Code § 301.051,** *et seq.*
**(On Behalf of Plaintiffs Terri Pepper, Bryant, and Hudson and the**
**Texas Telemarketing Class)**

240.     Plaintiffs Terri Pepper, Bryant, and Hudson incorporate the foregoing paragraphs 1–211 as if fully set forth herein.

241.     Defendants or third parties on Defendants' behalf made consumer telephone calls to consumers without immediately identifying themselves by name, the business on whose behalf they are calling, or the purpose of the call, in violation of Tex. Bus. & Comm. Code § 301.051(b).

242.     The consumer telephone calls were not in response to the express request of Plaintiffs Terri Pepper, Bryant, and Hudson and Texas Telemarketing Class members, nor primarily in connection with an existing debt or contract for which payment or performance has not been completed at the time of the call, nor to a consumer with whom the telephone solicitor has a prior or existing business relationship.

243.     The text messages alleged herein constitute consumer telephone calls from a telephone solicitor under Tex. Bus. and Comm. Code §§ 301.001(4)–(5).

244.     Plaintiffs Terri Pepper, Bryant, and Hudson and Texas Telemarketing Class members were injured as a result of Defendants' violations of Texas law alleged herein and are therefore entitled to an award of damages, plus reasonable attorney's fees and court costs. Tex. Bus. and Comm. Code § 301.104.

<u>**COUNT VI**</u>
**Violations of Wash. Stat. § 19.160.010,** *et seq.*
**(On Behalf of Plaintiff Cody Pepper and the Washington Commercial Text Class)**

245.    Plaintiff Cody Pepper incorporates the foregoing paragraphs 1–211 as if fully set forth herein.

246.    Defendants' practice of transmitting and/or assisting in the transmission of electronic commercial text messages to Plaintiff Cody Pepper's and Washington Commercial Text Class members' cellular telephones violates Wash. Stat. § 19.190.060. Violations of Section 19.190.060 constitute *per se* violations of Washington's Consumer Protection Act, Wash. Stat. § 19.86.010, *et seq*.

247.    Defendants conducted these practices in the scope of their trade and in furtherance of the development and preservation of business services.

248.    Defendants' violations of the Washington Consumer Protection Act are intentional, willful, and subject to treble damages under Wash. Stat. § 19.86.010, *et seq.*

249.    Plaintiff Cody Pepper and Washington Commercial Text Class members have suffered injuries to their persons and property as a direct result of Defendants' numerous violations of Wash. Stat. § 19.86.010, *et seq.*

250.    Defendants' practices are emblematic of organizational policies and agreements among Defendants and others which have caused, and if unchecked, will continue to cause incidents, occurrences, and conduct which are in violation of Wash. Stat. § 19.86.010, *et seq*. and Wash. Stat. § 19.190.010, *et seq*.

251.    Plaintiff Cody Pepper and the Washington Commercial Text Class members are entitled to recover damages for each of Defendants' violations under Wash. Stat. § 19.190.010, *et seq.*, including liquidated damages of $500 per violation under Wash. Stat. § 19.160.040(1), and

other remedies available under the Washington Consumer Protection Act, Wash. Stat. § 19.86.010, *et seq*.

252.     Plaintiff Cody Pepper and the Washington Commercial Text Class members will continue to be damaged if Defendants are not compelled to abate their unlawful conduct, as alleged herein.

253.     Plaintiff Cody Pepper and the Washington Commercial Text Class members are entitled to all attorneys' fees, costs, and treble damages as allowed by Wash. Stat. § 19.86.010, *et seq*., and as otherwise allowed by law.

**COUNT VII**
**Violations of Wash. Stat. § 80.36.005, *et seq*.**
**(On Behalf of Plaintiff Cody Pepper and the Washington Telemarketing Class)**

254.     Plaintiff Cody Pepper incorporates the foregoing paragraphs 1–211 as if fully set forth herein.

255.     Defendants' practice of failing to identify themselves, masquerading as other entities or businesses, and failing to identify the purpose of the call violates Wash. Stat. § 80.36.390(2).

256.     Defendants' practice of using automatic dialing and announcing devices, as defined by Wash. Stat. § 80.36.400(a), for the purposes of commercial solicitation violates Wash. Stat. § 80.36.400.

257.     Defendants' foregoing violations are intentional and willful.

258.     Plaintiff Cody Pepper and Washington Telemarketing Class members have suffered injuries to their persons and property and were aggrieved by repeated violations as a direct result of Defendants' numerous violations of Wash. Stat. § 80.36.390 and Wash. Stat. § 80.36.400.

259.     Plaintiff Cody Pepper and the Washington Telemarketing Class members are entitled to recover damages for each of Defendants' violations, including liquidated damages of

$100 per violation under Wash. Stat. § 80.36.390(6) and $500 per violation under Wash. Stat. § 80.36.400(3).

260.    Plaintiff Cody Pepper and the Washington Telemarketing Class members will continue to be damaged if Defendants are not compelled to abate their unlawful conduct, as alleged herein.

261.    Plaintiff Cody Pepper and the Washington Telemarketing Class members are entitled to all attorneys' fees and costs, as allowed by Wash. Stat. § 80.36.390(6), *et seq.*, and as otherwise allowed by law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually, and on behalf of all others similarly situated, pray for an Order as follows:

A.    Finding that this action satisfies the prerequisites for maintenance as a class action and certifying the Classes defined herein;

B.    Designating each Plaintiff as representative of the respective Classes, and the undersigned counsel as Class Counsel;

C.    Entering judgment in favor of Plaintiffs and the Classes and against Defendants, jointly and severally;

D.    Awarding Plaintiffs and the Classes actual damages, statutory damages, treble damages, and punitive damages, and all other forms of available relief;

E.    Entering an injunction enjoining Defendants from sending further unsolicited text messages and from engaging in the other unlawful conduct alleged herein;

F.    Awarding attorney's fees and costs, including interest thereon, as allowed by law; and

G.    Granting other relief as the Court deems just and appropriate.

## JURY DEMAND

Plaintiffs demand a trial by jury on all counts so triable.

DATED: December 14, 2021                    Respectfully submitted,

*/s/ Javier L. Merino*
Javier L. Merino
**DANN LAW**
1520 U.S. Highway 130, Suite 101
North Brunswick, NJ 08902
*notices@dannlaw.com*
(201) 355-3440- Direct
(216) 373-0539- Main
(216) 373-0536- Fax

Thomas A. Zimmerman, Jr.
(*admitted pro hac vice*)
*tom@attorneyzim.com*
ZIMMERMAN LAW OFFICES, P.C.
77 W. Washington Street, Suite 1220
Chicago, Illinois 60602
(312) 440-0020 telephone
(312) 440-4180 facsimile
*www.attorneyzim.com*

Max Morgan
(*admitted pro hac vice*)
*Max.morgan@theweitzfirm.com*
Eric Weitz
(*admitted pro hac vice*)
*Eric.weitz@theweitzfirm.com*
THE WEITZ FIRM, LLC
1528 Walnut Street, 4th Floor
Philadelphia, PA 19102
(267) 587-6240 telephone
(215) 689-0875 facsimile

*Counsel for Plaintiffs and the Putative Classes*