**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____

**CODY PEPPER, ET AL.,**

                     **Plaintiffs,**          **21-cv-6581 (JGK)**

       **- against -**               **MEMORANDUM OPINION**
                                          **AND ORDER**

**FLUENT INC., ET AL.,**

                     **Defendants.**
_____

**JOHN G. KOELTL, District Judge:**

    The plaintiffs, Cody Pepper, Terri Pepper, Julius Bryant, Kimberly Hudson, DeMya Johnson, and Allison Powers, brought this putative class action against defendants Fluent, Inc. ("Fluent") and Reward Zone USA, LLC ("Reward Zone"), alleging violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA"), and certain analogous state statutes. These claims arise out of the plaintiff's allegations that the two defendants caused the plaintiffs to receive various unsolicited and unauthorized text messages. See First Am. Compl., ECF No. 34. The defendants moved to dismiss the claims against them pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), and they also moved for an order compelling two of the plaintiffs, Julius Bryant and Terri Pepper, to arbitrate their claims. ECF Nos. 44, 46. As relevant here, the defendants argued that Mr. Bryant and Ms. Pepper were required to submit their claims against the defendants to binding arbitration because those plaintiffs had agreed to the Terms and

Conditions of certain Fluent-owned websites that included a mandatory arbitration clause and a class action waiver. See ECF No. 47. Mr. Bryant and Ms. Pepper denied that they had ever visited the relevant websites, much less agreed to arbitrate.

In August 2022, this Court ruled that it could not decide the defendants' motion to compel arbitration on the then-existing record because "plaintiffs Terri Pepper and Julius Bryant [had] raise[d] issues of fact as to whether they agreed to arbitrate this dispute." Aug. 9, 2022 Bench Op. Tr., ECF No. 65 ("Aug. 2022 Tr.") at 12-13; see also ECF No. 63. The Federal Arbitration Act ("FAA") provides that where, as here, a party has moved to compel arbitration and "the making of the arbitration agreement . . . [is] in issue," "the court shall hear and determine [the] issue" so long as the nonmoving party has not demanded a jury trial on the matter. 9 U.S.C. § 4; see Dedon GmbH v. Janus et Cie, 411 F. App'x 361, 363 (2d Cir. 2011). Accordingly, this Court authorized expedited discovery on the limited question of "whether there was an agreement to arbitrate between the defendants and plaintiffs Terri Pepper and Julius Bryant," ECF No. 63, and, because those plaintiffs did not request a jury trial on the issue, the Court set a date for an evidentiary hearing. Id.; Aug. 2022 Tr. 13.[1]

---

[1] Unless otherwise noted, this Memorandum Opinion and Order omits all internal alterations, citations, footnotes, and quotation marks in quoted text.

This Court conducted the evidentiary hearing on October 11, 2022. Having reviewed the evidence and assessed the credibility of the witnesses, the Court makes the following Findings of Fact and reaches the following Conclusions of Law.

## FINDINGS OF FACT

### I. The Relevant Parties

1. Fluent is a digital advertising company that specializes in connecting potential consumers with brands through online advertisements hosted on its or its affiliates' websites. Oct. 11, 2022 Evid. Hearing Tr. ("Tr.") at 6, 58; see also Barsky Decl., ECF No. 29-3, ¶ 7.

2. Reward Zone, also a digital advertising company, is a wholly owned subsidiary of Fluent that operates various websites through which consumers can register to earn merchandise or gift cards from advertisers. DX8 at FLUENT0050; Barsky Decl. ¶¶ 5, 7.

3. Jeff Richard is the Senior Director of Data Privacy and Compliance at Fluent. Tr. 3.

4. Terri Pepper, a resident of The Woodlands, Texas, is a former public-school employee and preschool coordinator. Tr. 82-84. Ms. Pepper is now retired. Id. 83-84.

5. Julius Bryant, a resident of Arlington, Texas, is a former City of Dallas employee. Tr. 101-102. Mr. Bryant is now retired. Id. 102.

## II. **Fluent's Websites and Collection of User Data**

6.   As part of its business, Fluent operates various websites that are designed to attract potential consumers and encourage their exposure to online advertisements for certain brands. See Tr. 6. Fluent's websites include job websites, where users can seek information about job opportunities, and reward websites, where users can sign up to receive specified products and other rewards. Id. 6, 17, 31, 33-34. Some of the websites are not operated by Fluent directly, but are instead operated by its subsidiaries, such as Reward Zone and Search Works Media, LLC ("Search Works"). Id. 58; DX8 at FLUENT0050; Barsky Decl. ¶ 24.

7.   To drive internet traffic to its websites, and thereby increase exposure to the online advertisements featured there, Fluent relies on third-party publishers to promote its websites through commercial emails, web-based advertising, social media advertising, and other paid media. Tr. 76-77.

8.   To access certain aspects of Fluent's websites, users must complete a registration process, which requires that users submit specified personal information to Fluent. See, e.g., id. 6-7, 17-18, 33-34. Typically, users are asked to provide their first and last name, email address, street address, city, state, zip code, date of birth, gender, and telephone number. Id. 6-7.

9.   When a user accesses a Fluent website, Fluent also collects certain metadata from the user's device automatically.

4

See id. 7, 20. This metadata includes each device's "user agent string," which identifies the type of device, operating system, and browser used to connect to Fluent's servers. Id. 7-8, 23. For example, Richard testified that the user agent string can be used to determine whether the device was "an iPad, iPhone, an Android device, [or] a desktop computer," or whether the internet browser was "Chrome, Internet Explorer, or Firefox." Id. 23.

10.  Fluent collects all of this personal information and metadata contemporaneously with the user's visit to the Fluent website. Id. 8. Each user's information is eventually stored in Fluent's "archive database," which houses Fluent's historical data and all previous iterations of its webpages. Id. 8, 12.

### III. Terri Pepper

11.  Fluent's archive database contains data indicating that a user identified as "Terri Pepper" registered on one of Fluent's job websites, FindDreamJobs.com, at approximately 3:30 p.m. EST on October 30, 2017. Id. 10; DX1. The registration information archived for that particular user contains the following personal details: an email address, ███████████████; a phone number, ███████████; a date of birth, ███████████; and a city, state, and zip code, namely Magnolia, Texas, 77354. See DX1.

12.  Fluent's archive database also contains the specific user agent string for the device used to complete Ms. Pepper's alleged registration with FindDreamJobs.com on October 30, 2017.

Tr. 20; DX4. Based on this user agent string, Richard testified that the relevant device was an Apple iPad running version 11.0.3 of the iOS operating system, and also that the browser used to access Fluent's website was Safari. Tr. 22, 24, 26.

13.  Richard testified that the user agent string for the "particular iPad" associated with Ms. Pepper's registration would "probably" be "very similar" to the user agent strings for other "iPads around the same date and time." Id. 28-29. Richard also testified that "Safari is the default browser installed on iOS devices, like iPads." Id. 27.

14.  Using historical records stored in Fluent's archive database, Fluent was able to reconstruct the registration page on FindDreamJobs.com as it would have appeared to the user "Terri Pepper" on October 30, 2017. See id. 11-14; DX2.

15.  At the time of that user's visit to FindDreamJobs.com, the top of the registration page featured a large white heading, "FindDreamJobs," followed by three large form fields for a first name, last name, and email address. DX2; see also Tr. 11. Richard testified that the user was likely prompted to enter a date of birth, phone number, and zip code on another webpage, and that Fluent would have determined the city and state based on the user's zip code. See Tr. 56-57.

16.   Beneath the webpage's form fields was an optional checkbox, alongside small white text that stated, "Yes! I want daily email alerts for new jobs in my area." DX2; Tr. 15-16.

17.   Under that checkbox and corresponding text, the webpage included a sentence in even smaller white lettering (the smallest on the entire page), which stated: "I understand and agree to the Terms, which includes mandatory arbitration and Privacy Policy, and agree to receive daily emails from FindDreamJobs." DX2. Richard testified that the underlined words contained hyperlinks to the Terms & Conditions and Privacy Policy applicable on October 30, 2017. See Tr. 16-17, 52. A large, rectangular, bright green button labeled "GET STARTED" appeared in the middle of the webpage, underneath those hyperlinks. DX2.

18.   The Terms & Conditions were referenced again toward the bottom of the registration page in small white text, which stated in pertinent part, "To gain access to the job listing, you must agree to our Terms & Conditions and Privacy Policy." Id. The webpage's footer contained additional small white text, "Terms and Conditions | Privacy Policy | Unsubscribe," which contained hyperlinks to the Terms & Conditions and Privacy Policy as well. Id.; see Tr. 53.

19.   To access the applicable Terms & Conditions mentioned on the registration page, the user would have had to click on the "Terms" or "Terms & Conditions" hyperlink. See Tr. 18-19. Those

Terms & Conditions did not mention Fluent or Reward Zone at all,
but instead referred only to Search Works, the Fluent subsidiary
that operates many of Fluent's job websites. DX3; see Tr. 58.

20.   Those Terms & Conditions included the following
provision, labeled "Mandatory Arbitration":

> **Mandatory Arbitration**. These Terms & Conditions contain
> a mandatory arbitration provision that requires you to
> individually arbitrate any disputes or claims you may
> have with us and waives your right to participate in a
> class action or multi-party arbitration. You may opt out
> of the mandatory arbitration provision by providing
> written notice of your decision within thirty (30) days
> of the date that you first register on a Site.

DX3 at FLUENT0043. Subsequent provisions state that all
disputes related to the Terms & Conditions or to the website
must be submitted "for resolution by arbitration before the
American Arbitration Association," and that "[t]he arbitrator
will have exclusive authority to resolve [any such] disputes."
Id. at FLUENT0047. These provisions also state that the user
must "agree . . . not [to] bring, join or participate in any
class action lawsuit as to any claim, dispute or controversy
against us." Id. at FLUENT0048. All uses of "us" refer to
Search Works. See id. at FLUENT0043; Tr. 58-60.

21.   Ms. Pepper denies that she ever agreed to any contract
through FindDreamJobs.com. See Pepper Decl., ECF No. 36, ¶ 7. Ms.
Pepper testified that she has never visited the website, that she
has never inputted information into the website or authorized or

asked another person to do so, and that she had not heard of the website at all until this litigation. Tr. 84.

22.   Ms. Pepper officially retired from her last job as a preschool coordinator in May 2017, and she testified that she has been "very happily enjoying" her retirement. Tr. 83-84. Ms. Pepper also testified that, in the time since her retirement, she has not searched online for any new jobs or even considered returning to work. Id. 84.

23.   Ms. Pepper further testified that on October 30, 2017, the date on which she is alleged to have visited FindDreamJobs.com at about 3:30 p.m. EST (or 2:30 p.m. CST in Texas), Ms. Pepper had a dentist appointment scheduled for 1:00 p.m. CST in a different part of The Woodlands, about a 25-minute drive away from her own home. Id. 85. Ms. Pepper estimated that the dentist appointment would have lasted "approximately an hour," and she recalled that the appointment started late. Id. 85, 87. Ms. Pepper accordingly testified that, with the 25-minute drive, the earliest she would have arrived back home was likely "a little after" 2:30 p.m. CST, or 3:30 p.m. EST. Id. 87.

24.   Ms. Pepper also testified that she likely ran errands after her dentist appointment, because the dentist's office was located near the grocery store and other retailers. Id. 85, 88. It is Ms. Pepper's practice to "make an afternoon" of running

errands when she has appointments in that part of The Woodlands, in order to avoid unnecessary 25-minute trips each way. Id. 88.

25.   In her testimony, Ms. Pepper explained that The Woodlands is an unincorporated township that overlaps with four Texas towns. See id. 82. Ms. Pepper lives in the "sliver" of The Woodlands that falls within the town of Magnolia, Texas. Id. She has always described herself as a resident of The Woodlands, not of Magnolia, although her personal zip code is the Magnolia zip code (77354) because of the geographic overlap. Id. 83.

26.   Ms. Pepper also testified that, on the date that she is alleged to have accessed FindDreamJobs.com, she did use the email address ████████████████. See id. 92. In addition, she used an Apple iPad with a Safari browser at the time. Id. 90-91.

### IV. Julius Bryant

27.   Fluent's archive database contains data indicating that a user identified as "Julius Bryant" registered on a Fluent reward website operated by Reward Zone, OnlinePromoUSA.com, at just after 4:00 p.m. EST on August 1, 2016. Tr. 29; DX6; see also Barsky Decl. ¶ 24. The registration information archived for that particular user contains the following personal details: an email address, ████████████████; a phone number, ████████████████; a date of birth, October 30, 1960; an address, 1600 Chestnut Street, Dallas, Texas, 75226; and a gender identification, which stated "Female." See DX6; DX7 at FLUENT0060.

28.   Fluent's archive database also contains the specific user agent string for the device used to complete Mr. Bryant's alleged registration with OnlinePromoUSA.com on August 1, 2016. Tr. 37, 39; DX9. Based on the user agent string, Richard testified that the device was a desktop computer running the Microsoft Windows 10 operating system, and also that the browser used to access the reward website was Chrome. Tr. 37, 39.

29.   Using historical records stored in Fluent's archive database, Fluent was able to reconstruct three webpages from the registration process on OnlinePromoUSA.com as those pages would have appeared to the user "Julius Bryant" on August 1, 2016. See id. 30-31; DX7.

30.   At the time of the user's visit to OnlinePromoUSA.com, each of the three registration pages were identical, except that the form fields on each page requested different information. See DX7. The left-hand side of each page advertised a promotion for an iPad Air, and the right-hand side featured large red text that stated, "Congratulations!" just above a large black box with the sentence, "Complete your information to continue." Id. Under the black box, each webpage featured a series of large form fields, which together requested the user's first name, last name, zip code, street address, city, state, phone number, date of birth, and gender. Id.

31.  Under the form fields, in small grey text that appears to be the smallest writing on each page, the webpage stated, "I understand and agree to the Terms & Conditions which includes mandatory arbitration and Privacy Policy." Id. The underlined terms were hyperlinks. See Tr. 34. That statement was followed by a slightly larger prompt to sign up for promotional emails, which appeared alongside a checkbox, and then by a large red "Submit" button. DX7.

32.  The Terms & Conditions were referenced again in a black box at the bottom of the web page, which contained several paragraphs of small white text. Id. The second paragraph stated, in relevant part, that "By participating, you agree to the Terms & Conditions which includes mandatory arbitration and Privacy Policy." Id. Each webpage's footer also included the underlined phrase "Terms & Conditions" in small white text. Id.

33.  Richard testified that clicking on a "Terms & Conditions" hyperlink would have produced the Terms & Conditions applicable to the user on August 1, 2016, titled "RewardZoneUSA, LLC Websites – Terms and Conditions." Tr. 34-35; see DX8. In that set of Terms & Conditions, the phrases "we" and "us" referred to Reward Zone. See DX8 at FLUENT0050.

34.  Those Terms & Conditions included several paragraphs under the heading "Arbitration/Dispute Resolution," which stated, in part, that all disputes "concerning any aspect of these Terms

12

& Conditions, the Website, your participation in a Promotion, or entitlement to an Incentive" must be submitted "for resolution by arbitration before the American Arbitration Association," and also that "the arbitrator will have exclusive authority to resolve any dispute." Id. at FLUENT0051-52. Users were also "prevent[ed] . . . from bringing, joining or participating in class action lawsuits" against Reward Zone. Id. at FLUENT0052. The final paragraph in the "Arbitration/Dispute Resolution" section provided, in bold capitalized letters, as follows:

> You acknowledge and agree that, via your acceptance of these dispute resolution provisions, you waive any right to a jury trial, as well as your right to bring, join, or participate as a plaintiff or a class member in a class action suit or multi-party arbitration brought against us, any person related to us or a service provider used by us to provide the service.

> Id.

35.  Mr. Bryant denies that he ever agreed to any contract through OnlinePromoUSA.com. See Bryant Decl., ECF No. 37, ¶ 7. Mr. Bryant testified that he has never visited the website, that he has never inputted information into the website or authorized or asked another person to do so, and that he had not heard of the website at all until this litigation. Tr. 104-105.

36.  Before his retirement in June 2022, Mr. Bryant spent 17 years working for the City of Dallas. See Tr. 102. On August 1, 2016, the date on which Mr. Bryant is alleged to have visited OnlinePromoUSA.com, Mr. Bryant was employed as a code officer in

the city attorney's office. Id. Before that job, Mr. Bryant spent four and a half years as a police officer. Id.

37.  As a code officer, Mr. Bryant typically spent most of the workday conducting property inspections. See id. He testified that he was usually in the office only in the mornings and at the end of the workday, which was when Mr. Bryant would input all of the information collected during his inspections into a database on his work-issued laptop computer. See id. 107.

38.  Mr. Bryant testified that on August 1, 2016, at roughly 4:30 p.m. EST, the time at which he is alleged to have registered on OnlinePromoUSA.com, he was likely back at the office inputting information into the database, which was typically "one of [the] busiest periods" in his workday. Id.

39.  Mr. Bryant's work-issued laptop computer was a Windows device with the browser Internet Explorer. See id. 103-104. He testified that access to websites was restricted in the office. Id. 104.

40.  In August 2016, Mr. Bryant also owned a personal laptop computer, which was similarly a Windows device with the browser Internet Explorer. Id. 109-110. Mr. Bryant testified that he never brought his personal laptop computer to work. Id. 107.

41.  Mr. Bryant has had an email account with the address ███████████████ since 1999, although he rarely uses it. Id. 107-108, 111.

42.  Mr. Bryant testified that the address associated with his alleged registration on OnlinePromoUSA.com -- 1600 Chestnut Street, Dallas, Texas, 75226 -- was not his personal address, but rather an old work address from his prior job as a police officer. Id. 105. Specifically, that address was the location of the Dallas City Marshal's Office at the Detention Service Center, where Mr. Bryant had not worked since March 2013. Id. 105-106.

43.  Mr. Bryant testified that he may have used that old work address for package delivery "[o]n a couple of occasions" while he was employed there. Id. 106. He could not recall using that old work address in any other instance. Id.

44.  Mr. Bryant, who identifies as male, also testified that he would not have selected "female" as his gender. Id. 106.

45.  Finally, Mr. Bryant testified that his date of birth is not October 30, 1960. Id.

## CONCLUSIONS OF LAW

### I. Standards Governing the Existence of an Arbitration Agreement

1.  The FAA provides that "[a] written provision in . . . a contract . . . to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2. Pursuant to the FAA, any party "aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration" may seek

a district court order directing that "arbitration proceed in the manner provided for in such agreement." Id. § 4.

2.   While the FAA "embodies a national policy favoring arbitration," the statute "does not require parties to arbitrate when they have not agreed to do so." Nicosia v. Amazon.com, Inc., 834 F.3d 220, 228-29, 230 (2d Cir. 2016) (quoting Schnabel v. Trilegiant Corp., 697 F.3d 110, 118 (2d Cir. 2012)); see Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ., 489 U.S. 468, 478 (1989).

3.   Thus, the "threshold question facing any court" on a motion to compel arbitration is "whether the parties have indeed agreed to arbitrate." Schnabel, 697 F.3d at 118; see Nicosia, 834 F.3d at 229. "That question is governed by state-law principles of contract formation." Starke v. SquareTrade, Inc., 913 F.3d 279, 288 (2d Cir. 2019); Nicosia, 834 F.3d at 229.

4.   This Court has already determined that New York law governs the issue of whether an arbitration agreement exists in this case, because the plaintiffs did not dispute the defendants' argument that New York law applies. See Aug. 2022 Tr. 11-12; see also Mason Tenders Dist. Council of Greater N.Y. v. Concore Equip., Inc., No. 03-cv-634, 2011 WL 5548912, at *9 n.2 (S.D.N.Y. Nov. 10, 2011); cf. Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000) ("[I]mplied consent [of the parties] . . . is sufficient to establish choice of law.").

16

5.   Under New York law, "[i]t is a basic tenet . . . that, in order to be binding, a contract requires a 'meeting of the minds' and 'a manifestation of mutual assent.'" Starke, 913 F.3d at 288 (quoting Express Indus. & Terminal Corp. v. N.Y. Dep't of Transp., 715 N.E.2d 1050, 1053 (N.Y. 1999)). Thus, "a party cannot be held to have contracted if there was no assent or acceptance." Id. at 289. A party manifests such assent "by [any] word, act, or conduct which evinces the intention . . . to contract." Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 427 (2d Cir. 2004).

6.   New York law also provides that where a contracting party "does not have actual notice of certain contract terms, [that party] is nevertheless bound by such terms if [the party] is on inquiry notice of them and assents to them through conduct that a reasonable person would understand to constitute assent." Starke, 913 F.3d at 289 (emphases in original).

7.   All of these principles apply to online transactions and "web-based contracts." Id. For example, a visitor to a website may indicate assent to an online agreement with a click, so long as the relevant interface provided the visitor "with objectively reasonable notice" -- actual or inquiry -- of the agreement's terms and conditions. Id. (citing Meyer v. Uber Techs., Inc., 868 F.3d 66, 77-80 (2d Cir. 2017)).

8.   "Under New York law, the party seeking arbitration bears the burden of proving that a valid arbitration agreement

17

exists . . . by a preponderance of the evidence." <u>Solis v. ZEP LLC</u>, No. 19-cv-4230, 2020 WL 1439744, at *4 (S.D.N.Y. Mar. 24, 2020) (quoting <u>Kutluca v. PQ New York Inc.</u>, 266 F. Supp. 3d 691, 700-01 (S.D.N.Y. 2017)). Thus, the moving party "must prove by a preponderance of the evidence that all the elements necessary to form a valid contract are met, namely offer, acceptance, consideration, mutual assent, and intent to be bound." <u>Id.</u>

## II.   The Defendants Have Not Sustained their Burden of Proving that Ms. Pepper Agreed to Arbitrate Her Claims

9.   In their motion to compel arbitration, the defendants argue that Ms. Pepper entered into a valid arbitration agreement with Fluent by registering to use FindDreamJobs.com on October 30, 2017. <u>See</u> ECF No. 47 at 3-4. The defendants also argue that the FindDreamJobs.com registration page put Ms. Pepper on "inquiry notice," if not actual notice, of the mandatory arbitration provision in the applicable Terms & Conditions. <u>Id.</u> at 4-5.

10.  These arguments fail because the defendants have not sustained their burden of proving, by a preponderance of the evidence, that Ms. Pepper ever visited the website on which she is alleged to have entered into the arbitration agreement.

11.  Ms. Pepper testified that she never accessed FindDreamJobs.com, a jobs website that allowed users to seek information about job opportunities, and she provided a credible and reasonable explanation for that testimony. Ms. Pepper retired

from her last job in May 2017, five months before the user "Terri
Pepper" visited FindDreamJobs.com, and she testified credibly that
she has not searched online for new jobs or even contemplated
returning to work since her retirement.

12.   Based on her recall of the day's events and her usual
practices, Ms. Pepper also gave credible testimony that at 3:30
p.m. EST (2:30 p.m. CST) on October 30, 2017, Ms. Pepper was
likely engaged in activities other than visiting websites online.
The evidence suggests that, at the very least, Ms. Pepper was
driving home from a dentist appointment at the time of the
alleged registration, if she was not still out running errands.

13.   Thus, it would be unreasonable to find that Ms. Pepper
visited FindDreamJobs.com on October 30, 2017, because Ms. Pepper
simply had no reason to visit such a website after her retirement
five months earlier, and she testified credibly that she never did
so. Ms. Pepper's testimony that she was occupied with other tasks
at the purported registration time likewise undercuts any
conclusion that she visited the website as alleged.

14.   The defendants argue that their archived registration
data for Terri Pepper, which was recorded contemporaneously with
the registration, is sufficient to sustain the defendants' burden
and should be credited over Ms. Pepper's testimony. See Tr. 116.
But to the extent Ms. Pepper's personal information matches up
with the information in Fluent's archive database, that alignment

falls short of proving that Ms. Pepper visited the website by a preponderance of the evidence.

15.   The user who registered on FindDreamJobs.com plainly used the name "Terri Pepper," and Ms. Pepper testified that she did have the email address (███████████████) and the zip code (77354) associated with the alleged registration. However, while Richard testified that the website may have automatically derived Ms. Pepper's city and state based on her zip code, the defendants did not offer into evidence any webpage requesting a zip code or other residential information. Ms. Pepper's testimony indicates that, if asked, she would have listed her city as The Woodlands, not Magnolia, which is the city associated with the registration on FindDreamJobs.com. The defendants did not elicit testimony from Ms. Pepper as to whether the date of birth and phone number associated with the registration matched her own date of birth and phone number.

16.   The defendants place substantial weight on the user agent string linked to Ms. Pepper's alleged registration, which indicated that the user named "Terri Pepper" accessed the website while using an iPad with the Safari browser. Ms. Pepper testified that she did possess an iPad with Safari at that time.

17.   However, this evidence as to the general type of device and internet browser is not enough to link Ms. Pepper's specific device to the registration at issue, especially in light

of Ms. Pepper's credible testimony explaining why she would not have visited the website at that time.

18.   Moreover, insofar as Ms. Pepper's information does overlap with the registration data, alternative explanations for that overlap exist. For example, it is possible that Ms. Pepper's device was hacked, or that a third party purchased or acquired her data elsewhere and entered some of that data into the website at issue. Those explanations are at least as credible, if not more credible, than the defendants' argument that Ms. Pepper -- who flatly denied visiting FindDreamJobs.com and who supported that denial with specific, credible testimony -- simply has a "faulty recollection" as to whether she visited the website. Tr. 116.

19.   In sum, the defendants have failed to establish, by a preponderance of the evidence, that Ms. Pepper ever visited the website where she is alleged to have encountered an agreement to arbitrate her claims. The defendants have therefore failed to show that a valid arbitration agreement was formed, because Ms. Pepper could not have assented to arbitration via a website that she never actually accessed in the first place.

20.   Because the defendants have failed to establish that Ms. Pepper ever visited FindDreamJobs.com, it is not necessary to address the defendants' argument that the website provided sufficient inquiry notice of the mandatory arbitration provision.

### III. The Defendants Have Not Sustained their Burden of Proving that Mr. Bryant Agreed to Arbitrate His Claims

21.  In their motion to compel arbitration, the defendants argue that Mr. Bryant entered into a valid arbitration agreement with the defendants by registering to use OnlinePromoUSA.com on August 1, 2016. See ECF No. 47 at 5. The defendants also argue that the OnlinePromoUSA.com registration pages put Mr. Bryant on inquiry notice, if not actual notice, of the mandatory arbitration provision in the applicable Terms & Conditions. Id. at 6-8.

22.  These arguments fail because the defendants have not sustained their burden of proving, by a preponderance of the evidence, that Mr. Bryant ever visited the website on which he is alleged to have entered into the arbitration agreement.

23.  The user who registered on OnlinePromoUSA.com plainly used the name "Julius Bryant," and Mr. Bryant testified that he did have the email address (██████████████) associated with the alleged registration.

24.  However, based on the evidence presented, it is not plausible that Mr. Bryant would have inputted the other personal details associated with his alleged registration. The address in Fluent's database is not Mr. Bryant's personal address, but rather an outdated work address at the Dallas Detention Service Center. Mr. Bryant left his post at the Detention Service Center in March 2013, long before the registration on OnlinePromoUSA.com, and his

credible testimony indicates that he has not used that address
for any purpose since then.

25.  Furthermore, the date of birth and gender linked to
Mr. Bryant's alleged registration are both wrong. Mr. Bryant was
not born on October 30, 1960, and he does not identify as female.
The defendants have not provided any explanation for these clear
discrepancies, which cast significant doubt on their theory that
Mr. Bryant himself registered with OnlinePromoUSA.com.

26.  The user agent string associated with Mr. Bryant's
alleged registration does not compensate for these discrepancies.
Mr. Bryant testified that both his work-issued computer and his
personal computer were Windows devices, which corresponds to the
operating system in the user agent string for his alleged visit
to OnlinePromoUSA.com on August 1, 2016. However, as discussed
above with regard to Ms. Pepper, the general type of operating
system is not enough to link Mr. Bryant's specific device to the
registration at issue.

27.  Moreover, the rest of the information gleaned from the
user agent string is inconsistent with Mr. Bryant's testimony on
the devices he used at the time. The user agent string indicates
that the user "Julius Bryant" accessed the website using the
Chrome browser on a desktop computer. But Mr. Bryant's personal
computer and work computer were both laptops, not desktops, and
his browser was Internet Explorer, not Chrome.

28.  Given the substantial and unexplained discrepancies between Fluent's registration data for "Julius Bryant" and Mr. Bryant's true information, it would be unreasonable to conclude, based on a preponderance of the evidence, that Mr. Bryant in fact visited OnlinePromoUSA.com. As with Ms. Pepper, it is not hard to envision alternative explanations for the alleged registration -- for example, that Mr. Bryant was hacked or that an unknown third party obtained and inputted his information -- which are at least as credible as the defendants' theory that Mr. Bryant is simply misremembering whether he registered on their website.

29.  This conclusion finds further support in Mr. Bryant's credible testimony that the registration occurred at one of the busiest times in his typical work day, during which Mr. Bryant was usually focused on inputting field notes into a work-issued computer with restricted internet access.

30.  In sum, the defendants have failed to establish, by a preponderance of the evidence, that Mr. Bryant ever visited the website where he is alleged to have encountered an agreement to arbitrate his claims. The defendants have therefore failed to show that a valid arbitration agreement was formed, because Mr. Bryant could not have assented to arbitration using a website that he never actually accessed in the first place.

31.  Because the defendants have failed to establish that Mr. Bryant ever visited OnlinePromoUSA.com, it is not necessary

to address the defendants' argument that the website provided sufficient inquiry notice of the mandatory arbitration provision.

## CONCLUSION

The Court has considered all of the parties' arguments. To the extent not specifically addressed above, those arguments are either moot or without merit.

For the foregoing reasons, the defendants have not carried their burden of proving by a preponderance of the evidence that Ms. Pepper and Mr. Bryant agreed to arbitrate their claims in this case. Accordingly, the defendants' motion to compel arbitration, ECF No. 46, is **denied**. Moreover, because the defendants sought dismissal of Ms. Pepper's claims and Mr. Bryant's claims on the same grounds asserted for the other plaintiffs, see ECF No. 45, and because this Court's reasons for rejecting those arguments apply equally to Ms. Pepper and Mr. Bryant, see Aug. 2022 Tr. 13-17, the defendants' motion to dismiss, ECF No. 44, is **denied** insofar as it concerns Ms. Pepper's and Mr. Bryant's claims.

The Clerk is respectfully directed to close all pending motions and to lift the stay on this case.

**SO ORDERED.**

Dated:     New York, New York
           July 14, 2023

                                    _____
                                         John G. Koeltl
                                 **United States District Judge**