**SheppardMullin**

Sheppard, Mullin, Richter & Hampton LLP
1901 Avenue of the Stars, Suite 1600
Los Angeles, California 90067-6055
310.228.3700 main
310.228.3701 fax
www.sheppardmullin.com

310.228.2259 direct
jramsey@sheppardmullin.com

File Number: 72AS-380223

November 1, 2023

**VIA ECF**
Honorable Barbara C. Moses
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007

Re:     Discovery Conference, *Pepper v. Fluent*, No. 1:21-cv-06581-JGK (BCM)

Dear Judge Moses:

Defendants Fluent, Inc. and Reward Zone USA, LLC's (collectively, "Fluent") respond to Plaintiffs' Request for Discovery Conference.

## Background And General Response

This is not a typical TCPA case.  Plaintiffs all received different text messages, on different dates, from different phone numbers, each including different website hyperlinks.  Those hyperlinks did not go to the same website, and the varied websites they linked to were operated by unknown parties, not Fluent.  After landing on those non-Fluent websites, Plaintiffs navigated through a series of different and varied questions, screens, clicks, spinning wheels, and other pages, sometimes pressing the back button on their web browser, sometimes clicking ads, and sometimes visiting yet other non-Fluent sites.  After confusing and circuitous routes, all unlike any of the others, each Plaintiff (or their representative) somehow ended up on a Fluent-operated website.  All in, there are thirty unique fact patterns involving six different Plaintiffs and seven different proposed classes.

Fluent did not send the text messages and did not authorize them.  Fluent has produced its policies, procedures, and contractual documents clearly showing that it did not allow text messages at all, except in narrow circumstances, and then, only if certain criteria were met.  None of the messages at issue resemble anything that was permitted by Fluent.  Plaintiffs are thus arguing that Fluent, despite having not authorized these messages, somehow knew about them and did nothing to stop them.

The core problem is that Fluent has yet to figure out who sent the messages and may never be able to do so.  When Plaintiffs (or someone on their behalf) visited Fluent's website, they did not enter any of their personal information and, as a result, Fluent cannot tie any of the visits to anything in its records.  Similarly, although Plaintiffs recorded their interactions with the tet messages and their circuitous routes through the internet, Plaintiffs did not retain the full website URLs of the Fluent websites they ultimately visited.  These full URLs are the most important data points because full URLs generally include evidence that would allow Fluent to tie a website visit to something in its records.  Plaintiffs' failure to maintain and provide this URL information is a big reason that the parties are at an impasse.

In any event, even if Fluent could tie a website visit to something in its records, Fluent likely could not determine how any Plaintiff got to Fluent's website.  A large portion of the time, Fluent

1

**SheppardMullin**

does not receive "refer URL" information – meaning, it doesn't know what page someone came from before they landed on Fluent's website.  Even if Fluent did have "refer URL" information for a visit, at best, Fluent could identify the last website in the circuitous route taken to get there.  Fluent cannot reach further back along the path to discover who sent the original text message.

Of course, even if Fluent could identify the original senders of the text messages, there cannot possibly be a suggestion that Fluent can be held liable for the original text message.  For example, Plaintiff DeMya Johnson (Dkt. 34, ¶¶ 112-119) claims to have received a text message from (803) 686-4049 on December 23, 2020.  It contained a link (jjmhb.me/wnNUm9zX4B), which she purportedly pressed (or someone pressed for her).  That link opened an internet browser, and then "automatically and instantaneously" opened a series of intermediary domains (none operated by Fluent), including jjmhb.me, torialaty.com, sorisy.com, go.bosquinte.com, and eventually landed on cloud-inbox.online, a website not operated by or affiliated with Fluent, that offered a chance at prizes for completing a survey.  After completing the survey and clicking other buttons, Plaintiff (or her representative) was directed to chancetowins.com, another non-Fluent website.  The "user" then "selected the back button [in their web browser] several times," and ended up on instantprizewinner.com, another non-Fluent website.  That website had an advertisement that, if clicked, took the "user" to Fluent's website.  It is perfectly legal for Fluent to buy ad space on websites.  The fact that one of those websites may be connected to some other website, which is connected to some other website, and so on, and some party twenty steps earlier sent a text message, does not mean Fluent violated the TCPA.

Despite all the above, Fluent has undertaken great effort to identify the senders of the text messages, and that effort is ongoing.  Fluent is, for example, searching publicly available records for information reflecting who operates the various websites at issue, and then will use any information it can find to search its records for any matches.  It is also taking any information that Plaintiffs learn through other subpoenas and searching its records.  And Fluent is searching its records for the dates on which Plaintiffs (or their representatives) allege to have landed on Fluent's websites and seeing if it can locate any visit with a "refer URL" associated with the domains alleged in the Complaint.  To the extent Fluent identifies any information that may be germane to the text messages at issue, Fluent will produce it.

Plaintiffs say Fluent's efforts are unacceptable, and instead resort to overbroad, "give me everything" discovery, asking for Fluent's entire database, "all" documents about every "publisher" that Fluent has ever worked with (a list that spans over 4,500 publishers), even if there is no suggestion that the publishers were involved, and "all" documents about a wide range of other topics.  This is a massive overreach and must be rejected.  The parties are working together to identify the senders of the messages.  The results of that (assuming they can identify anyone) will define the appropriate scope of discovery.

Fluent's goal is to reach a reasonable compromise whereby the parties can proceed through a process of exchanging information to identify the senders of the text messages.  That may require a discovery referee.  If the parties are unable to work through a process, Fluent requests full briefing on any aspect of the motion that the Court is inclined to grant so it can explain all the issues with Plaintiffs' discovery demands.

### Responses To Plaintiffs' Issues

**1.      Identifying "Publishers" (Interrogatory Nos. 3-8, 16, RFPs 5-6, 12)**

As explained above, Fluent is searching as best it can to identify the publishers.  In addition, Plaintiffs have subpoenaed website records of the domains at issue, trying to figure out who operates those domains.  As those identities comes in, Fluent has committed to (i) searching its

records for anything that matches and (ii) identifying publishers associated with those companies.  That is a logical first step in the process and the parties agree on it.  Fluent has also committed to searching its "refer URL" information and is continuing to do so.  As a result, this topic, as framed in the letter, is largely undisputed.  The actual discovery requests seek far more information than Plaintiffs suggest in their letter.  Defendants are confining their response to what Plaintiffs now seek to compel.

Plaintiffs request that Fluent identify every one of the over 4,500 publishers it has worked with should be rejected.  Fluent presumes that Plaintiffs want to subpoena those publishers, but wild goose chases should not be permitted.  Plaintiffs have already served overbroad subpoenas on some of Fluent's publishers, asking for information well-beyond the confines of Plaintiffs' claims.

Finally, Plaintiffs' argument that Fluent failed to maintain documents and website links is false.  If anything, Plaintiffs did not collect or provide full URL information of the websites they landed on, thereby hindering the parties' efforts.  That is Plaintiffs' problem, not Fluent's.

**2.    Identifying Fluent employees who approve "Publishers" and transactions (Interrogatory Nos. 9, 10, 13)**

Fluent identified the internal teams responsible for approving Publishers.  Plaintiffs' requests seek information over a six-year period, which is overbroad and irrelevant.  Until the parties can identify the relevant parties, identifying who approved them (if at all) is impossible.

**3.    Plaintiffs' information and activity (RFPs 2-4)**

Fluent has committed to providing this information, to the extent it has it.  There is no dispute.

**4.    "Publisher" conversions (RFP 7)**

This request is completely irrelevant.  How many times publishers have driven traffic to Fluent's websites, when those publishers have nothing to do with either Plaintiffs' website visits or the text messages at issue, is nothing other than a fishing expedition.  If the parties ultimately identify the senders of the text messages or other relevant parties, and those parties are publishers that have engaged in similar activity, this information may be relevant.  But until there is some connection between Plaintiffs' allegations and this information, it is outside the scope of discovery and therefore unduly burdensome to gather.  Finally, Plaintiffs' reference to the *Berman* matter is erroneous.  That case settled after class certification was initially denied, long before the merits were reached.  Plaintiffs' claim that the *Berman* plaintiffs used conversion information to "prove" anything is incorrect.

**5.    "Publisher" (and other) contracts, negotiations, and due diligence (RFPs 9, 10, 21)**

This request is again a fishing expedition.  Fluent's contracts with every publisher it works with, and the other website vendors and more mentioned in the RFPs, are simply not relevant until those parties are connected in some way to Plaintiffs' claims.  The same is true of documents relating to all those vendors.  This is also a vast amount of information, and therefore the burdens of collecting and producing it greatly outweigh the benefit of the information.

**6.    Defendants' oversight, handling of complaints, knowledge, approval, and intent (RFPs 11, 13, 14, 17, 21, 22, 24, 27, 29, 31-33)**

Documents related to parties unconnected to Plaintiffs' allegations and text messages are not discoverable.  Nonetheless, Defendants are searching for complaints concerning text messages that advertised Fluent's services regardless of whether there is any nexus to this case.  Fluent

**SheppardMullin**

does not have sufficient room in this letter to explain why each RFP is improper.  It can do so at the hearing or in full briefing.

## 7. Documents relating to government investigations (RFPs 18, 19, 30)

Plaintiffs baldly assert that Fluent has been subject to a "number of civil lawsuits and governmental investigations and enforcement actions regarding the same telemarketing practices at issue in the FAC."  That assertion is unsupported and incorrect.  Fluent is not aware of another case resembling the facts alleged here.  Here, Plaintiffs received text messages from some unknown, unauthorized third-party; Plaintiffs (or their representatives) then clicked around, and about, and around, until they landed on a Fluent website, even pressing the back button in their web browser; and, for reasons unknown, Plaintiffs sued Fluent, rather than any of the other interim parties or websites.  This is unlike any other case or investigation, or frankly any fact pattern, raised in the past.  As a result, all documents about those other cases and investigations are beyond the scope of discovery.  Plaintiffs cannot fish for information about other alleged wrongdoings in hopes of finding a claim they may be able to assert.

## 8. Internal communications and business strategy documents (RFPs 8, 23)

Internal Fluent communications and "business strategy" documents are not relevant unless they relate in some way to the alleged practices in the Complaint.  Of course, at this stage, the parties don't even know what happened or whether Fluent was involved.  Until Plaintiffs know who sent the text messages at issue and can tie Fluent to those messages in some way, Fluent cannot possibly come up with a set of documents or topics to search for, let alone an ESI protocol.  It is also no solution to just ask for everything, which the RFPs do.  RFP No. 8 seeks any document or communication with any "call placement vendor, affiliates, web traffic platforms, and publishers," including internal documents about the same and third-party communications about the same.  In other words, RFP 8 says, "give me everything you have about any party you have ever worked with."  Such overbroad requests should be rejected.  Similarly, RFP 23 seeks documents "relating to business proposals, strategies, presentations, and analyses of Defendants' ability to attract users to Defendants' websites and media properties, and to generate revenue from activities thereon in a cost-effective manner, including documents relating to Defendants' so-called 'Media Margin.'"  The allegations in the Complaint have *nothing* to do with what happens on Fluent's website.  They are instead about the text messages received and what happened *before* Plaintiffs (or their representatives) landed on Fluent's websites.

## 9. Documents relating to server logs and user activity (RFPs 36, 37)

These RFPs seek information about the total number of visits to any of Fluent's websites, from August 4, 2017 to the date of trial, irrespective of how visitors got to the website, what they did thereon, whether they received a text message, and so on.  That has nothing to do with this case.  Plaintiffs are not claiming that every visitor to Fluent's website is a member of any purported class.  Nor are they claiming every publisher somehow engaged in wrongdoing.  Indeed, at this point, they aren't claiming any specific publisher did anything.  The discovery should be rejected.

**SheppardMullin**

Sincerely,

/s/ Jay T. Ramsey (*admitted pro hac vice*)

Jay T. Ramsey
for SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

SMRH:4877-1467-5084.2

5