UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF NEW YORK

In re:                              :
                                         Docket #21cv6581
PEPPER, et al.,                     :

                    Plaintiffs,     :

   - against -                      :

FLUENT, INC., et al.,               : New York, New York
                                      January 16, 2024
                    Defendants.      :

------------------------------------ :

                         PROCEEDINGS BEFORE
                   THE HONORABLE BARBARA C. MOSES,
                    UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiffs:          THE WEITZ FIRM, LLC
                         BY:  MAX MORGAN, ESQ.
                         1515 Market Street, Suite 1100
                         Philadelphia, Pennsylvania 19102

                         ZIMMERMAN LAW OFFICES, P.C.
                         BY:  JEFF BLAKE, ESQ.
                         77 West Washington Street, Suite 1220
                         Chicago, Illinois 60602

For Defendants:          SHEPPARD MULLIN
                         BY:  JAY RAMSEY, ESQ.
                         1901 Avenue of the Stars, Suite 1600
                         Los Angeles, California 90067

Transcription Service:   Carole Ludwig, *Transcription Services*
                         155 East Fourth Street #3C
                         New York, New York 10009
                         Phone:  (212) 420-0771
                         Email:  Transcription420@aol.com

Proceedings conducted telephonically and recorded by
electronic sound recording;
Transcript produced by transcription service.

## INDEX

### E X A M I N A T I O N S

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---------|--------|-------|-----------|----------|
| None | | | | |

### E X H I B I T S

| Exhibit Number | Description | ID | In | Voir Dire |
|----------------|-------------|----|----|-----------|
| None | | | | |

```
 1                        PROCEEDINGS                    3
 2          THE CLERK:  Cody Pepper, et al. v. Fluent, Inc.,
 3  case number 21cv6581.  Counsel, please make your
 4  appearances for the record, starting with counsel for
 5  plaintiffs
 6          MR. MAX MORGAN:  Good morning, Your Honor, Max
 7  Morgan on behalf of plaintiffs.
 8          MR. JAY RAMSEY:  Good morning, Your Honor, it's
 9  (indiscernible) for the defendants.
10          THE COURT:  Okay, Mr. Morgan for the plaintiffs,
11  Mr. Ramsey for the defendants.  And how about you, Mr.
12  Blake?
13          MR. JEFF BLAKE:  Good morning, Your Honor, Mr.
14  Blake for the plaintiffs.
15          THE COURT:  Also for the plaintiffs.  Okay, who
16  between counsel who is presenting on today's essentially
17  motion to compel or possibly motion for sanctions?  I'm
18  not sure this is a 37(a) or 37(b) motion, but one you is
19  going to tell me.
20          MR. MORGAN:  Your Honor, I'll be speaking today.
21  The matter before Your Honor is for a contempt for
22  failure to comply with the Court's previous order on the
23  motion to compel that we filed a month or two back.
24          THE COURT:  Well, there are two pieces, as I
25  understand it, to today's motion, one of which you just
```

```
 1                          PROCEEDINGS                    4

 2   mentioned is a, can only be a 37(b) motion with respect

 3   to my last court order.  Let me put that on the back

 4   shelf for just a minute and deal with what may be the

 5   simpler motion.  You also want a particular defendant for

 6   deposition, correct?

 7           MR. MORGAN:  There are – yes, Your Honor,

 8   there's a few things.  So in our letter we requested

 9   there's an individual that's referenced in the FTC

10   documents.  We'd like to know their identity.  We've

11   requested it because we'd like to take that person's

12   deposition.  The defendants refused to provide that

13   individual's identity or provide a deposition date.

14           There are also, intermingling with the Court's

15   prior issue, the individuals that have been identified as

16   past employees.  The defendant was supposed to provide

17   with their last known contact information.  We discussed

18   with defense counsel whether they would accept subpoenas

19   and whether or not they'd be representing them.  We have

20   not received a definitive answer.  So if they are not

21   going to be accepting the subpoenas and representing

22   these individuals, we would like their contact

23   information so we can move forward with depositions.

24           THE COURT:  All right, well, as to Mr. or Ms.

25   Executives listed in the FTC complaint, isn't that, don't
```

```
 1                          PROCEEDINGS                    5

 2   we already have a rule for dealing with that and isn't it

 3   Rule 30?  Can't you just send the deposition notice and

 4   identify your proposed witness with reference to the FTC

 5   complaint since you don't know the name yet?

 6            MR. MORGAN:  We are happy to do so, Your Honor.

 7   We think though we'll likely be back before Your Honor if

 8   that is the case.  Trying to short circuit things and,

 9   you know, try to get a schedule worked out with

10   everybody, but we're happy to do that.

11            THE COURT:  Well, I'm afraid you didn't really

12   short circuit things because you wrote me all these

13   letters about it instead of simply sending off the notice

14   which would've teed it up.  With respect to the folks

15   whose names you do know, correct, but who you need to

16   subpoena because the defendants tell you they don't work

17   there anymore and you don't know where they are?

18            MR. MORGAN:  Yes, Your Honor.

19            THE COURT:  Let me hear briefly from Mr. Ramsey

20   on that.  We don't want to waste time here with

21   shenanigans.  Mr. Ramsey, normally in a situation like

22   this, if the corporation's attorney is not willing to

23   accept service of the subpoena, which happens sometimes,

24   I simply direct you to produce the contact information.

25   Why should I not do that here?
```

```
 1                         PROCEEDINGS                    6
 2              MR. RAMSEY:  Yes, Your Honor.  So we already
 3    told the other side that we're going to be representing
 4    three non, non-lawyers, former employees, excuse me --
 5              THE COURT:  Non-lawyers and former employees.
 6              MR. RAMSEY:  Non-lawyers as well.
 7              THE COURT:  And give me their last names please
 8    just so I can follow along here at home/
 9              MR. RAMSEY:  Ey yi yi.
10              THE COURT:  Somebody give me --
11              (interposing)
12              MR. RAMSEY:  I wasn't prepared for that.  I
13    could get them for you.
14              THE COURT:  This is why I make people come into
15    the courtroom.  You're always better prepared if I make
16    you pack up your briefcase and come on in.
17              MR. RAMSEY:  I will find those names for you in
18    a moment.
19              MR. MORGAN:  I can give them to you, Your Honor.
20              THE COURT:  Hold on, hold on, I think that Mr.
21    Morgan can give them to me.
22              MR. MORGAN:  All right, so the three individuals
23    that were identified as non-employees are Stephanie
24    Crouch, C-R-O-U-C-H --
25              THE COURT:  Thank you.
```

```
 1                          PROCEEDINGS                    7

 2              MR. MORGAN:  -- and - I'm sorry?

 3              THE COURT:  Go ahead.

 4              MR. MORGAN:  Hannah, H-A-N-N-A-H, Park, P-A-R-K.

 5    And Mohit Singla, that's M-O-H-I-T, last name S-I-N-G-L-

 6    A.

 7              THE COURT:  Okay.  So Crouch, Park, and Singla.

 8    Mr. Ramsey.

 9              MR. RAMSEY:  Yeah, so we told them that we would

10    be representing them and could accept service of the

11    subpoena.  The issue was whether we would then be moving

12    for a protective order, and I sent an email to meet and

13    confer about that and then never got either a subpoena or

14    a response to the meet and confer.

15              THE COURT:  Protective order for what purpose?

16              MR. RAMSEY:  There's a - I know we're getting to

17    it at the end, but there is a I think foundational issue

18    that they're going after the former employees first.  You

19    know, they can do what they want.  They haven't taken a

20    30(b)(6).  They have - I don't even know what they're

21    going to ask them about yet because, as we discussed last

22    time, we had - they don't even know who yet sent any of

23    the messages.  And I understand, you know, and I would

24    like to discuss this with them because I don't think it

25    makes sense to bother a former employee before we even
```

 1
 2    know anything about the case.  Now, again --
 3            THE COURT:  I'm not --
 4            (interposing)
 5    MR. RAMSEY:  -- they can do what they want --
 6            THE COURT:  I'm not hearing the grounds for a
 7    protective order in there.  I'm just not.
 8            MR. RAMSEY:  I know, but I --
 9            (interposing)
10            THE COURT:  You know - Mr. Ramsey --
11            (interposing)
12            THE COURT:  -- Mr. Ramsey, you know the
13    deposition rules, you know the definition of relevance
14    under Rule 26(b).  I expect and you can expect opposing
15    counsel to adhere to that.  If in the event you feel that
16    they are asking irrelevant questions, as you know, this
17    is also in Rule 30, you cannot instruct on that basis,
18    but if they're completely out of line, you have other
19    remedies including seeking a protective order.  Generally
20    speaking, you cannot, however, run to court for a
21    protective order because you think in a deposition that
22    hasn't happened yet they might ask irrelevant questions.
23    That's just not the way the rules work.
24            Now, that said, if they are playing games with
25    you, which you suspect, if plaintiffs' counsel are

PROCEEDINGS                    9

deliberately keeping you in the dark about what they're going to ask these folks about, that could very well result in an unhelpful description, unhelpful in several respects.  First, because most of the transcript is going to end up people objecting and arguing with each other, and unhelpful in a second respect, namely, if you're representing these folks and they won't tell you what the subject of the deposition is, then you won't be able to prepare them very well, and we'll have a whole lot of I don't know, I don't remember.  Gee, I'd have to refresh my recollection with stuff I don't have with me, particularly in the case of ex-employees.

So I'm not - let me just be clear, plaintiffs, I'm not endorsing this approach if, indeed, it is the approach you're taking, but as you say, Mr. Ramsey, generally speaking, each side gets to determine for itself the order in which it wishes to take depositions. And for parties' depositions, which these effectively are, they're not required to clear the subjects with you in advance.

MR. RAMSEY:  I agree.  I just was hoping to discuss all of that with the other side before we got to this point and having had --

THE COURT:  Well, I think that it would be good

```
 1                         PROCEEDINGS              10
 2   --
 3            (interposing)
 4            THE COURT:  I think that's a good hope, but you
 5   can't hold out on the contact information while you're
 6   hoping --
 7            MR. RAMSEY:  Well, I did --
 8            THE COURT:  Hold on --
 9            (interposing)
10            MR. RAMSEY:  -- accept service.
11            THE COURT:  You will either accept service by
12   the end of this week, Friday, or provide more recent
13   contact information by the end of this week.  You may, of
14   course, simultaneously negotiate or attempt to negotiate
15   over what these folks are going to be asked about.
16   They're going to have to talk to you anyway just about
17   logistics, right, time and place.  So, Mr. Morgan, I
18   suggest that you have at least a little bit of a
19   conversation about what these folks are in for once you
20   get them under oath.  Let's not - let's not violate Rule
21   1 here.  That's the part about being cooperative --
22            MR. MORGAN:  Certainly, Your Honor --
23            THE COURT:  -- before we even get started with
24   depositions.
25            And really the same goes to you, Mr. Ramsey, for
```

1                        PROCEEDINGS                        11

2    the executive named in the FTC complaint.  You can hold

3    out and say send me a Rule 30 subpoena, excuse me, send

4    me a Rule 30 deposition notice describing this individual

5    rather than naming this individual or you can just give

6    them the name which they're going to find out anyway once

7    the fellow is sitting in front of them under oath.  So

8    let's try to keep that sort of thing to a minimum,

9    gentlemen.

10           Now, can we talk about documents?

11           MR. RAMSEY:  Yes, Your Honor.

12           THE COURT:  All right, so, Mr. Morgan, I issued

13   an order saying that the defendants have to produce to

14   you documents previously produced to the FTC if and to

15   the extent that those documents concern unwanted text

16   messages.  That was language that the defendants proposed

17   at the last hearing, and now we know why.  Now they say,

18   wait a minute, that's not really what the FTC complaint

19   was about.  The FTC was interested in the content of

20   these messages not on whether they were wanted or

21   unwanted.  And you say, well, a lot of the messages that

22   we're complaining about in our complaint are the same

23   messages or very similar messages that the FTC was

24   complaining about in its complaint.  True.  But you're

25   complaining about them for different reasons.

1

2          Here, you're complaining that these messages

3   never should've been sent in the first place regardless

4   of their content, misleading or otherwise, whereas the

5   FTC is content concerned, content focused primarily.  So

6   we sort of have a philosophical question here.  Why

7   should I not agree with the defendants that this is just

8   not what the FTC was after?

9          MR. MORGAN:  So, Your Honor, to start, I think

10  really the resolution of this is as simple as looking at

11  count 5 of the FTC complaint, which was for assisting and

12  facilitating violations of the telemarketing sales rule,

13  which is a law that's very similar to the TCPA, you know,

14  prohibits sending, you know, spam messages, right,

15  unwanted calls and text messages.

16         So I do think that the FTC complaint did

17  obviously go beyond just the narrow of issue of sending

18  unwanted text messages or, you know, making unwanted

19  calls, but it's certainly, while it also discussed the

20  content of the messages, it certainly at various points,

21  you know, certainly also addressed the unsolicited nature

22  of these types of messages.

23         So, you know, I think to just say, hey, that's

24  totally off base, then investigate us for unsolicited

25  messages at all I think is just wrong.  And, secondly,

```
 1                          PROCEEDINGS                    13
 2   you know, the information in this, we believe the
 3   information in the FTC complaint is certainly relevant
 4   because we're trying to figure out, you know, which
 5   companies were responsible as the publishers for Fluent
 6   that sent the messages.
 7              (interposing)
 8              THE COURT:  What does the TRS say, what does the
 9   telemarketing sales rule, 16 C.F.R. § 310.4(b)(1)(B),
10   what does it actually say?
11              MR. MORGAN:  I can pull it up if you could --
12              THE COURT:  I knew you could.  I had confidence.
13              MR. MORGAN:  So 310.4 is titled Abusive
14   Telemarketing Acts or Practices, and you asked for --
15              THE COURT:  310.4(b)(1)(v).
16              MR. MORGAN:  So (b)(1) is Pattern of Calls.  It
17   is an abusive telemarketing act or practice and a
18   violation of this rule for a telemarketer to engage in or
19   for a seller to cause a telemarketer to engage in the
20   following conduct, and it was – it was .4?
21              THE COURT:  5.
22              MR. MORGAN:  5, initiating any outbound
23   telephone call that delivers a prerecorded message other
24   than a prerecorded message permitted for complaint with a
25   call, abandonment, and safe harbor.  So that is calls --
```

```
 1                          PROCEEDINGS                14
 2              THE COURT:  So that's telephone calls not texts.
 3              MR. MORGAN:  Prerecorded calls.
 4              MR. BLAKE:  Your Honor, this is Jeff Blake for
 5    the plaintiffs.  I would also point out that the --
 6              (interposing)
 7              THE COURT:  Sorry, Mr. Blake, we don't do, this
 8    is not tag team here.  That's why I asked whose motion
 9    this is.  Generally speaking, it's one lawyer per side
10    per motion; otherwise it's just chaos.  Sorry about that.
11              MR. BLAKE:  I apologize.
12              THE COURT:  I have great confidence in your
13    colleague Mr. Morgan.
14              MR. MORGAN:  I think (b)(1)(iii) is initiated an
15    outbound telephone call to a person.  In the TSR I must
16    admit it's not an area that I practice in frequently, but
17    I know under the TCPA a telephone call, the FTC has
18    expanded that language to include text messages.  I would
19    suspect that there is something very similar to that as
20    well under the TSR.
21              THE COURT:  But not what the FTC was going for
22    apparently in this particular case.
23              MR. MORGAN:  I am not – I mean I do know that
24    the TSR does regulate calls and text messages.  I think
25    it was certainly applicable.  I think the defendant
```

```
 1                          PROCEEDINGS                    15
 2   obviously would know better than us.  I just want to look
 3   at one other paragraph.  I lost my place.
 4             (pause in proceeding)
 5             THE COURT:  So let me ask a broader question,
 6   sort of a philosophical question.  I don't read the
 7   administrative complaint, the FTC's complaint to focus on
 8   the same issue that you're focusing on here, that folks
 9   are getting text messages that they did not consent to
10   receive from folks you believe were agents of or in some
11   way working in cahoots with the defendants that you sued.
12             The FTC was concerned about consent, however,
13   from a slightly different angle.  If you look at the very
14   beginning of their complaint, paragraph 2, the FTC
15   charges the defendants have operated a massage consent
16   arm enterprise using deceptive ads to obtain consent that
17   the consumers didn't really intend to give or didn't
18   realize they were being asked to give or didn't realize
19   the breadth of the consent that they were purportedly
20   giving when they clicked on this blue button or that red
21   button or whatever it is that they clicked on.
22             So I guess let me turn to defendants' counsel at
23   this point because you are the one who suggested that
24   restrictive language to me and ask you in a sense isn't
25   the entire FTC complaint concerned with unwanted
```

1                          PROCEEDINGS                    16

2  solicitations in that the FTC charges you and others with

3  obtaining purported consent that wasn't true consent in a

4  misleading manner?

5          MR. RAMSEY:  Sure, so just quickly on counts 5,

6  if you look at the actual text of the complaint itself,

7  it's about prerecorded phone calls --

8          THE COURT:  Got it.

9          MR. RAMSEY:  -- specific allegations.  As for

10 your question, in paragraph 2, so the other thing we

11 discussed at the hearing last time is that the FTC

12 complaint was focused on what happens once consumers land

13 on Fluent's website.  And so let me back up a little bit.

14 There to me is a dividing line which is they, individuals

15 get to Fluent's website somehow.  They see an ad on

16 Facebook, they see an ad on the internet.  In this case

17 they allegedly get a text, whatever it is, they get to

18 the website.  Fluent then has various surveys and

19 different things and collects information and with that

20 information gets consent under the --

21         THE COURT:  You have other people solicit them

22 for other things.

23         MR. RAMSEY:  Correct.  So then we sell that

24 information to, I think I vaguely remember, all I could

25 think of last time was like a toothpaste brand but

```
 1                            PROCEEDINGS                    17
 2   whatever it is, right, we sell it to some other company
 3   that wants to market itself, and they reach out --
 4          THE COURT:  And apparently personal injury
 5   attorneys too.  Sorry, I spent some time with the FTC
 6   complaint over the weekend.
 7          MR. RAMSEY:  And so the allegations about the
 8   consent arm go to Fluent's website and its attempt or, in
 9   the way of the FTC's way of viewing it, alleged attempts
10   to get consent for those other companies or advertisers
11   or whatever you might want, marketing partners to then
12   contact people.  Certainly, the case is about whether the
13   consent that people provide on Fluent's website for calls
14   from these other companies that wase certainly at issue
15   all over the place in FTC – and from multiple respects.
16   One is are you attracting people to your website with an
17   advertisement that promises a reward or a chance to win
18   something without actually providing it.  So, you know,
19   are you pulling people to the website with an ad that's
20   misleading.  And then it was all about, well, are your
21   consent practices on the website sufficient, are the
22   fonts big enough, do you make them click a box, do you
23   have --
24          THE COURT:  Can they see the small print on
25   their phones, they're only on their laptops --
```

```
 1                         PROCEEDINGS                    18
 2             MR. RAMSEY:  Correct.
 3             THE COURT:  Right.
 4             MR. RAMSEY:  And so definitely about that.
 5             THE COURT:  So when I look at --
 6             MR. RAMSEY:  But to me that's not what this is
 7   about.
 8             THE COURT:  Sorry about that.  When I look at,
 9   for example, the allegations that the FTC makes beginning
10   at paragraph 98 of the complaint, which is on page 27, it
11   describes your allegedly false and misleading
12   (indiscernible) websites, and they allege, for example,
13   at paragraph 100 that you tricked consumers into clicking
14   check boxes and then treat that as blanket consent for
15   receiving telemarketing solicitations from lots and lots
16   and lots, dozens or even hundreds, they say, of third
17   parties and that these purported agreements are a, quote,
18   "crude attempt to circumvent the TSR's requirement that
19   to initiate a robocall," somebody didn't proofread, "the
20   specific seller obtained consent directly from a consumer
21   and only after providing clear and conspicuous
22   disclosure."
23             So these allegations go to what happens once the
24   consumer's on one of your websites, correct?
25             MR. RAMSEY:  Yes, then when we sell it to an
```

```
 1                        PROCEEDINGS                    19
 2   advertiser to --
 3            THE COURT:  Right, and they do not describe
 4   texts that a consumer may have received from what we've
 5   been calling publishers that drive the consumer to your
 6   site where these bad things allegedly happened to them.
 7            MR. RAMSEY:  There would be calls from
 8   advertisers after they're on our website.
 9            THE COURT:  Okay.  So let me go back to Mr.
10   Morgan.  I have to say I'm kind of leaning towards
11   defendants on this particular issue.  Can you point me to
12   the sort of - is there any portion of the FTC complaint
13   that we haven't yet discussed that you think gives you a
14   better hook for your argument?
15            MR. MORGAN:  Certainly, Your Honor, if you look
16   at paragraph 33 --
17            THE COURT:  Hold on.
18            (pause in proceeding)
19            THE COURT:  All right, I'm with you.
20            MR. MORGAN:  So it states, Defendants have
21   funneled consumers to their website by disseminating
22   their own ads and by paying affiliate markers or
23   publishers to disseminate ads containing the hyperlinks
24   to the Fluent generation sites.  Defendants know or
25   should know that the publishers often use ads that are
```

```
 1                        PROCEEDINGS                    20
 2  facially deceptive and make use of other abusive tactics
 3  such as text message spamming\, and browser hijacking.
 4  You know, text message spamming is unwanted text
 5  messages.  Browser hijacking is something that's very
 6  similar to what our clients experienced where they would
 7  click a link, and the browser would automatically divert
 8  them through a number of hops to the defendants'
 9  websites.
10          It then goes on, Nevertheless, defendants have
11  failed to prevent the publishers from engaging in this
12  illicit conduct.  In fact, sales executives have excused
13  and even encouraged this conduct.  The FTC makes these
14  allegations based on their investigation and I presume
15  reviewing documents and being aware of the specific
16  things such as what's referenced later on about the
17  Fluent executive, you know, editing the text messages and
18  sending them back to the publisher.
19          So while I agree the FTC investigation may have
20  focused on the calls that resulted from this entire
21  scheme, it certainly, there's certainly relevant
22  information here that's connected to how these
23  individuals first came to Fluent's website were, you
24  know, given our information and then that information was
25  sold and called based on the third parties.  So we view
```

1

2    it as one big chain and what we're after here is, you

3    know, the text messages that were ultimately sent and who

4    sent them and the knowledge of Fluent, right, because

5    that goes to whether it was a willful and knowing

6    violation under the TCPA.  And these documents suggest

7    that they certainly, you know, were aware and encouraged

8    this conduct, and that's the information that we're

9    seeking.

10           Fluent originally told us that none of this

11   exists, then we find this, you know, and that essentially

12   we're after the relevant information about the text

13   messages, what they knew, when they knew it, how they

14   knew it, what they were doing, what they were

15   encouraging.  I mean certainly our plaintiffs we recently

16   notified received messages that the third-party

17   publishers that the defendants identified in the recent

18   videos, right, based on the Court's order, they

19   identified a few publishers associated with messages that

20   our plaintiffs received that are referenced in the FTC

21   complaint, such as HasTraffic.  So certainly

22   communications with HasTraffic, information regarding

23   HasTraffic, you know, all of that's going to be relevant

24   to help us identify if that publisher was sending these

25   messages.

PROCEEDINGS                    22

          THE COURT:  Okay, Mr. Ramsey, paragraph 33
certainly seems a lot closer to the mark.  Let me ask you
a couple of background question.  How many documents or
pages or however you keep track did the defendants
produce to the FTC?

          MR. RAMSEY:  I don't know the precise number of
documents and pages.  It's a terabyte of data.

          THE COURT:  Okay.

          MR. RAMSEY:  It's a huge, huge, huge quantity.
Now, a lot of the data produced had to do with, you know,
call logs and things of that nature, so I don't want to
suggest that there's a terabyte of emails, but a lot of
data.

          THE COURT:  And when you produce documents to
the FTC, how was it organized?  For example, did the FTC
ask and did you respond to a document demand saying
you've produced all documents relevant to paragraph 43,
33 excuse me, which might make our job a lot easier.

          MR. RAMSEY:  Sure, so no, there was a CID that
came during the investigatory phase prior to the filing
of the complaint --

          THE COURT:  Right.

          MR. RAMSEY:  -- the filing of the complaint was
immediately followed by a consent order.  So that was all

1
2   negotiated, you know, as part of that process --

3           THE COURT:  So when the CID arrived, there was
4   no complaint yet.

5           MR. RAMSEY:  Yeah, it was long before.  And when
6   the complaint gets filed, then there's an immediate
7   consent order, that's all negotiated, you know,
8   beforehand.  So there wasn't any discovery post
9   complaint.  I have reviewed the CID, and there are not
10  requests, again, what we're talking about here.

11          THE COURT:  So I guess what plaintiffs' counsel
12  are now thinking to themselves is why should we believe
13  Mr. Ramsey when he says he's reviewed the CID and that
14  there's nothing relevant there?  I'm sure they don't mean
15  it in their heads personally, but, you know, you're
16  opponents, and that's how lawyers think about their
17  opponent.

18          MR. RAMSEY:  Sure, I get that.  I guess I would
19  say go look at the FTC complaint which is 55 pages and
20  138 paragraphs, and they found sort of one not even
21  complete sentence clause in the middle of paragraph 33
22  which comes in a section that deals with nothing about
23  unwanted text messages.  And they think that the
24  investigation was about unwanted text messages driving
25  traffic to Fluent's website.  So I mean just look at the

 1

 2   complaint itself.

 3           Now, I view this as a, I sort of come at it from

 4   a slightly different angle which is if they propounded a

 5   request tomorrow that said produce all emails, you know,

 6   about publishers that sent text messages or produce all

 7   emails about publishers that sent unwanted text messages,

 8   I don't know what Your Honor would do, but I think that

 9   would be overbroad and unduly burdensome.  That is not

10   narrowed to any publisher in the case.  It's not narrowed

11   to even a group of publishers.  And that is effectively

12   what they're saying.

13           I'm telling you that there's nothing, but then

14   to say, well --

15           (interposing)

16           THE COURT:  But as you say --

17           MR. RAMSEY:  -- anything about text.

18           THE COURT:  You're telling me there's nothing,

19   but you also tell me there's a terabyte of data.  So I

20   doubt you've read every email that was produced to the

21   FTC.

22           MR. RAMSEY:  I would not say that.  We have done

23   quite a bit of investigation into what was produced.  I

24   didn't just come in saying looking at the FTC complaint.

25           THE COURT:  So --

PROCEEDINGS                    25

1

2          MR. RAMSEY:  And that's why – sorry, go ahead.

3          THE COURT:  Suppose my order had been somewhat

4  differently worded and had directed you to produce all

5  documents previously produced to the FTC relevant to the

6  allegations in paragraph 33 of the complaint.  Would that

7  have produced nothing as well?

8          MR. RAMSEY:  I would need to look – no, 33 is

9  much broader than text messages.  33 is defendants have

10 funneled consumers to their website by disseminating

11 their own ads and by paying publishers to (indiscernible)

12 ads that contain hyperlinks.  I mean certainly we

13 produced lots of information --

14         THE COURT:  Defendants know or should know that

15 their publishers often use ads that are facially

16 deceptive and make use of other abusive tactics such as

17 text message spamming and browser hijacking.  Did you

18 produce any documents to the FTC concerning those abusive

19 tactics employed by your publishers?

20         MR. RAMSEY:  Narrowed to text message spamming,

21 my understanding is no.  I also don't, I know Mr. Morgan

22 wants to say the text message spamming is unwanted texts,

23 but that is, that's not what that is.  That means mass,

24 you know, sending thousands of messages at a time.

25         THE COURT:  Well, it could encompass sending

PROCEEDINGS                    26

1
2  messages to people who don't want them, but I take your
3  point that it doesn't necessarily.
4          MR. RAMSEY:  Correct.  And what – sorry.
5          THE COURT:  Go ahead.
6          MR. RAMSEY:  I was going to say if someone can
7  receive a message and then get the spam message, you
8  know, sent massively, they may later claim it's unwanted.
9  I mean but none of that was investigated.  Nothing about
10 whether consumers wanted or didn't want these messages
11 was investigated.
12         THE COURT:  In the same paragraph of my November
13 22 order, I required the defendants to produce documents
14 previously produced to the New York Attorney General with
15 the same limitation, which is, quote, "concerning the
16 issues of consumers being improperly driven to
17 defendants' websites directly or indirectly by unwanted
18 text messages."  Were any of portions of the AG
19 production produced in this case?
20         MR. RAMSEY:  No.  The AG investigation was even
21 farther afield than the FTC investigation.  It involved
22 an allegation that Fluent was hired by political
23 organizations to accumulate comments on proposed
24 rulemaking and that Fluent simply made up comments.  Had
25 nothing to do with text messages, had nothing to do even

```
 1                          PROCEEDINGS                    27

 2  with Fluent's websites.

 3           THE COURT:  All right, well, I'm not sure,

 4  counsel, that I have a basis here for holding anybody in

 5  contempt or, indeed, assessing any of the other sanctions

 6  available to me under Rule 37(b).  What is the order that

 7  plaintiffs would have me enter here and what's the basis

 8  for it, Mr. Morgan?

 9           MR. MORGAN:  So, Your Honor, I would ask that

10  the Court possibly modify then its order compelling the

11  defendants to produce documents with something somewhat

12  broader so that we don't have this, you know, parsing

13  words on what is and what is not relevant.  Perhaps, you

14  know, documents that refer to text messages that, you

15  know, in any way that point --

16           THE COURT:  Text messages sent by publishers?

17           MR. MORGAN:  Text messages sent by, yeah,

18  publishers or third parties.  And I'm hesitant because I

19  know that Fluent says it's not on their behalf and they

20  don't authorize it.  But I think that documents that

21  relate to text messages to get to those Fluent websites,

22  right, so the before activity, not, you know, you're at

23  Fluent's site and then they sell your data to other

24  people that call and text you.  This is all, you know,

25  pre website activity or activity that brings you to a
```

```
 1                          PROCEEDINGS                   28
 2   website.
 3            THE COURT:  If I were to order the defendants to
 4   produce as a larger subset of their FTC production, all
 5   documents produced to the FTC referring to text messages
 6   sent by publishers or third parties to drive consumers to
 7   Fluent's website, that's what you're going for here?
 8            MR. MORGAN:  I probably wouldn't say to drive
 9   consumers to the websites because I'm sure the defendants
10   will take some issue with that.  You know, I would prefer
11   it being a little broader to --
12            THE COURT:  Well, okay --
13            MR. MORGAN:  -- that relate to text messages.
14            THE COURT:  So --
15            (interposing)
16            MR. MORGAN:  -- what's going to happen is, oh,
17   these didn't - if you look at paragraph 39, this is,
18   again, they recruit and pay publishers to attract
19   consumers to their websites and, again, and note that
20   they do so with text messaging, I mean what we're really
21   after, right, is the documents showing what they knew,
22   when they knew it, and specifically the documents with
23   respect to the editing of the text messages by the
24   executives.  It looks like there's probably some internal
25   friction between the compliance department and the sales
```

1

2    department.  So I suspect there's likely those types of

3    documents because the FTC references --

4            THE COURT:  But that's, again, that's not your

5    issue --

6            MR. MORGAN:  Well, no --

7            (interposing)

8            THE COURT:  Wait, wait, wait.  If Fluent

9    executives are working with these publishers and third

10   parties to edit the text messages that these publishers

11   and third parties are sending out to drive or attract or

12   herd consumers to the Fluent website, that goes to the

13   FTC's issues, doesn't it, whether the content of these

14   communications was misleading, how do I draft an order

15   that makes it, that's broad enough so that if there's

16   anything out there in the FTC production that's genuinely

17   relevant to your case, you get it, but that isn't so

18   broad that it gets you just a boatload of material going

19   to content which is not your issue rather than going to

20   the sending of these messages to folks that are not

21   authorized to send any messages to at all which is, if I

22   understand it, your issue?

23           MR. MORGAN:  And I guess the two - I think it's

24   really difficult to divorce the two issues from one

25   another, right, because our case is about the publishers

1
2  who are sending text messages to people that didn't
3  consent.  The same text messages that we're talking
4  about, right, had deceptive content in them.
5  Communications about, you know, to a publisher saying,
6  hey, the content of this message that you're sending to
7  consumers is a little bit too aggressive, you need to
8  tone it down would certainly for us be relevant because
9  it would show, you know, Fluent to where the publisher is
10 sending the messages in the first place.  It would allow
11 us to – the content of the messages I think is relevant
12 here because it may allow us to identify which publishers
13 are associated with which messages.  Right?  We have
14 copies of our clients' messages, and if we can compare
15 those to the contents of the messages involved with
16 certain publishes, that may be a key for us to being able
17 to actually identify.  You know, matching what I did in
18 the letter, right, putting them up side by side, there's
19 a lot of very, you know, similarities here, and it's
20 difficult I think to really divorce issues of just, hey,
21 you shouldn't be sending text messages versus, you
22 shouldn't be sending text messages and, oh, by the way,
23 you know, the content in them is over the top.  Or if
24 we're ignoring the unwanted text message issue anyway and
25 we're going to turn a blind eye to it, then there really

PROCEEDINGS                    31

may not be many, you know, correspondence pushing back on

the idea of sending text messages.  Right?  It may be

that we're going to help you edit them or, you know, this

is what we want to see in the messages without anything

about them being unwanted or, you know, policies and

procedures or anything like that.

So that's my kind of overarching concern about

all this is that it's very difficult for us to kind of

pull the things apart and say what bucket, you know,

something fits into and what bucket it doesn't.

THE COURT:  Right.  On the other hand, opposing

counsel tells me and has told you that he has adequately

reviewed the FTC production and that there's nothing in

there that concerns the issue of consumers, and this is

the way I put it last time, being improperly driven to

defendant's website directly or indirectly by unwanted

text messages.

Now, if there was an email that went from Fluent

to one of these publishers saying, by the way, you know,

please make sure that all of your text messages, now that

we've toned them down some, only go to people who haven't

opted out, people you're entitled to send these to, that

would've been produced, should've been produced already.

Conversely, if there's an email which says, yeah, don't

```
 1                        PROCEEDINGS                    32
 2  tell me who you're sending these to because I don't want
 3  to know, that would've or at least should've been
 4  produced already.  But if I give you every email between
 5  Fluent and one of its publishers concerning the publisher
 6  text message, I think that's going to be overbroad
 7  because that's going to get you ninety-nine, maybe a
 8  hundred percent content related communication.
 9          And as to that, your relevance hook is – I mean
10  I understand your relevance hook.  Your best relevance
11  hook is, well, at least it shows that Fluent knew who
12  these publishers were and knew that they were sending
13  these emails, these text messages out.  I'm not sure
14  that's enough of a relevance hook to get you everything
15  that the FTC got.  I'm just – I think you may have to do
16  this another way, counsel.
17          You can, of course, you've got time left in your
18  discovery schedule.  You can send your own follow-on
19  discovery request, Rule 34 document request to the
20  defendants.  I'm sure you can come up with better
21  definitions and better limitations and better ways of
22  getting at this than the ones I thought of off the top of
23  my head in the last half hour.  But I'm not sure I have
24  any relief for you today on this issue with respect to
25  the prior order as applied to the FTC production.
```

```
 1                      PROCEEDINGS                    33

 2            MR. MORGAN:  Thank you, Your Honor.

 3            THE COURT:  All right, so I think that's it.  Is

 4   there anything else?  I'll put down on paper my oral

 5   ruling with respect to the witness information that has

 6   to be provided by the end of the week.  Your Honor, Mr.

 7   Ramsey, maybe I'll just order you to give them the name

 8   of the anonymous executive by the end of the week as

 9   well, that'll save time, or you can call him up after we

10   get off the line today and tell him.

11            All right, so nothing further from the

12   plaintiff?

13            MR. MORGAN:  There are a few other issues, Your

14   Honor.

15            THE COURT:  Go ahead, sir.

16            MR. MORGAN:  So the publisher agreements, we

17   were given documents that just appear to be template

18   documents.  It's our understanding that there should be,

19   you know, kind of works like a master services type

20   agreement where you would have insertion orders or

21   additional documents attached.  None of them are executed

22   or signed or anything like that.  So I question whether

23   we actually have the agreements between the publishers

24   that have been identified or not.

25            THE COURT:  Did you - did I miss this?  Was this
```

```
 1                        PROCEEDINGS                    34

 2   in your letter on January 2?

 3           MR. MORGAN:  So it was in our follow-up letter.

 4   We noted at the bottom of our first letter that there may

 5   be some initial issues because the defendants did not

 6   produce documents within the time period that the Court

 7   set.  They ended up subsequently producing them, and we

 8   believe that that production was inadequate and not in

 9   line with the Court's order.

10           THE COURT:  You're right, it's in your January 8

11   letter.  All right, and have you had any further

12   communication with defendants on this issue?

13           MR. MORGAN:  I believe we followed up but did

14   not yet receive a response about whether there's any

15   additional documents.

16           THE COURT:  Mr. Ramsey.

17           MR. RAMSEY:  They sent an email last Thursday

18   before the holiday weekend, and I am working on it.

19   Whether there's IO's or not to produce.  So I --

20           THE COURT:  Whether what?

21           MR. RAMSEY:  So we produced the contracts, what

22   you might refer to as the master services agreement, but

23   the question is whether there's effectively purchase

24   orders underneath it.

25           THE COURT:  Right.
```

```
 1                        PROCEEDINGS                    35
 2            MR. RAMSEY:  So I need to go look for that.  And
 3   the last we heard - we heard from them on Thursday, last
 4   Thursday.  I don't have an answer yet, unfortunately.
 5            THE COURT:  You agree that those additional
 6   documents come within the scope of what you're required
 7   to produce, correct?  So if you got them, you have to
 8   produce them.
 9            MR. RAMSEY:  I might quibble with that a bit,
10   but yes, we have no problem producing them.
11            THE COURT:  All right.  Do you need more than
12   this Friday to figure that out and produce them if you've
13   got them?
14            MR. RAMSEY:  The search for them is underway.  I
15   don't think it will take longer than this Friday.  It may
16   spill into the next, you know, Monday or Tuesday, but I
17   will produce them as soon as I have them.
18            THE COURT:  All right, preferably by this
19   Friday.
20            MR. RAMSEY:  All right.
21            THE COURT:  Actually, today's already Tuesday.
22   I'll give you till next Tuesday.  Everything I said I
23   would give you until Friday on, I'm going to give you
24   till next Tuesday on because it's a short week.  Anything
25   else, Mr. Morgan?
```

```
 1                        PROCEEDINGS                36

 2              MR. MORGAN:  The last issue, Your Honor, is we

 3    were given a lot of documents related to consumer

 4    complaints about text messages, and I believe the Court's

 5    order was a little bit broader.  That's also

 6    communications with publishers regarding these

 7    complaints.  We received no communications, email, other

 8    correspondence with any publishers regarding any consumer

 9    complaints about text messages.

10              THE COURT:  I think you're referring to

11    paragraph 6 of my November 22 order, is that right?

12              MR. MORGAN:  I believe that is correct.

13              THE COURT:  That's the paragraph that ordered

14    defendants to produce for attorney's eyes only, I'll read

15    it to you, "all non-privileged documents reflecting

16    complaints made during the four-year period preceding the

17    filing of this action by or on behalf of consumers

18    concerning unwanted text messages that directly or

19    indirectly drove traffic to the defendants' website as

20    well as follow-up correspondence between the complainants

21    and defendants or between defendants and the relevant

22    publishers and documents reflecting resulting

23    settlements, whether formal or informal."

24              MR. MORGAN:  That's correct, Your Honor.

25              THE COURT:  And what're you missing exactly?
```

```
 1                        PROCEEDINGS                 37

 2          MR. MORGAN:  We have not seen any correspondence

 3   between defendants and any publishers.  And it's unclear

 4   the response we received, it's unclear if documents were

 5   being withheld or, you know, I just want to kind of close

 6   the loop on that issue.

 7          THE COURT:  Mr. Ramsey.

 8          MR. RAMSEY:  Sure, so the way the files are kept

 9   are by complaint, and we went and pulled the folders for

10   those.  I do believe there are some communications with

11   publishers produced.  Most of these complaints are not

12   ever really addressed.  They are, looks like somebody

13   copied something from a website and sent it to us.  In

14   any event, I will continue to look for them, but my

15   understanding is that we produced, you know, we got a

16   complaint from so and so, here's the folder we keep on

17   it.

18          THE COURT:  And that folder would include any

19   correspondence between your clients and the publishers?

20          MR. RAMSEY:  That is – that is my understanding,

21   and so that's what we could produce, but I will go, I

22   said that I would go confirm this with Mr. Morgan on the

23   phone and so I will do that.

24          THE COURT:  And, Mr. Morgan, at some point, I

25   assume you're going to send a 30(b)(6) deposition notice
```

```
 1                    PROCEEDINGS                 38
 2   out, and one of your topics may well be give me someone
 3   who's knowledgeable about what happens when a complaint
 4   comes in and how you follow up and where you keep all the
 5   relevant documents, right?
 6           MR. MORGAN:  Certainly, Your Honor.  Yeah, we're
 7   hopeful to get some documents first and then conduct a
 8   30(b)(6), but, you know, we may advance that a little
 9   quicker.
10           THE COURT:  All right.  Is that the end of your
11   list, Mr. Morgan?
12           MR. MORGAN:  Yes, Your Honor.
13           THE COURT:  All right, well, then I will issue a
14   short order covering the points that we have covered
15   today and giving the defendants until a week from today
16   to produce the information or accept the subpoenas or do
17   the other things that we discussed, but I'm not going to
18   be giving you any Rule 37(b) relief with respect to the
19   FTC production.  Thank you very much, we will be
20   adjourned.
21           MR. MORGAN:  Thank you, Your Honor.
22           MR. RAMSEY:  Thank you, Your Honor.
23           (Whereupon, the matter is adjourned.)
24
25
```

39

C E R T I F I C A T E

     I, Carole Ludwig, certify that the foregoing transcript of proceedings in the case of PEPPERS, et al. v. FLUENT, et al., Docket #21cv6581, was prepared using digital transcription software and is a true and accurate record of the proceedings.

Signature_____*Carole Ludwig*_____

              Carole Ludwig

Date:    February 18, 2024